JOHN H. FITZPATRICK v. THE STATE.

*No. 1159. Decided January 13th, 1897.*

### 1. Order for Change of Venue—Presumptions as to.

Where the term of the court commenced by law on the 9th of December, and was authorized to continue in session until the business was disposed of; it will be presumed that an order for a change of venue in a case of murder, which was made on the 8th day of January following the convening of the court, was made while the court was in session. The transcript, for the change of venue, need not include the caption showing the term of court at which the order for change of venue was made.

### 2. Bills of Exception—Approval of by Judge on a Separate Piece of Paper.

Where there are several different bills of exception, which were approved by the judge on a separate piece of paper, in which he alluded to the bills seriatim, and makes explanations to a number of them. Held: The approval was sufficient, there being no rule of law or decision requiring bills of exception and the approval of the judge to be written on the same sheet of paper.

### 3. Witness—Examination of—Leading Questions Where Witness is Unfriendly.

Where a witness, after being put upon the stand by the State, appears to be unwilling and unfriendly to the prosecution, it is in the discretion of the court to allow leading questions to be put to him.

### 4. Same.

Where a witness for the State shows, that he is unfriendly and unwilling to testify about a matter about which he had testified on the examining trial, he may be treated as an adverse witness; and, his testimony given at the examining trial may be shown to him to refresh his memory, and he may be asked if he made the statement therein contained.

### 5. Cross-Examination—Evidence Explanatory of Evidence in Chief.

Where the defendant, in cross-examination of the State's witnesses, brings out part of the testimony in connection with record evidence of a former trial, the State may, on re-examination of the witnesses, bring out the remainder of the testimony to explain that which had been introduced by the defendant.

### 6. Impeachment of a Defendant as a Witness—Other Offenses not Felonies—Harmless Error.

The credit of a defendant, as a witness in his own behalf, cannot be impeached by evidence that he had committed other offenses, not felonies, and which do not in-

volve moral turpitude. But, see facts stated, which made the introduction of such evidence harmless error, inasmuch as it could not have injured or impaired the rights of defendant in view of the other testimony in the case.

### 7. Manslaughter—Insult to Female Relative.

On a trial for murder, where it appeared, that there was a wordy and violent altercation between the parties, during which deceased called defendant a "G—d d—n mother f——ng son-of-a-bitch." Held: The epithet was merely an insult to defendant himself, and not in the nature of a slander or insult towards a female relation, and did not reduce the killing from murder to manslaughter. Following, Graham v. State, 33 S. W. Rep., 537.

### 8. Murder—Abandonment of Difficulty by Deceased—Provoking and Renewal by Defendant—Manslaughter.

On a trial for murder, where it appeared, that, after a violent wordy altercation, deceased was leaving the place; had gone out of the room and started down a stairway, when defendant, armed with a pistol, followed him and taunted him with his cowardice, and called him a son-of-a-bitch, whereupon deceased returned up the steps and advanced towards defendant, when defendant shot and killed him. Held: Such facts, showing an abandonment by deceased, a renewal by defendant with provocation, and evidently a purpose of killing deceased if he resisted, or on his acceptance of the challenge to fight, to engage him in deadly conflict, in which the life of one or both might be sacrificed—there was no manslaughter in the case.

APPEAL from the District Court of Erath. Tried below before Hon. J. S. STRAUGHAN.

Appeal from a conviction for murder in the second degree; penalty, twelve years' imprisonment in the penitentiary.

Appellant was indicted in the District Court of Tom Green County, for the murder of F. S. Allen, by shooting him with a pistol, on the 2nd day of September, 1895. The venue was changed to Erath County.

The principal facts attendant upon the killing, are fully and sufficiently stated in the opinion. Nor is it necessary to make any additional statement to the statements made in connection with the several points discussed in the opinion.

The portion of the charge of the court with reference to provoking a difficulty, which was complained of by appellant, is as follows:

"On the other hand, if the defendant did not provoke a difficulty with Allen, or if he did provoke a difficulty with Allen, but if he did so without the apparent intention of killing or doing serious bodily injury to him, and if he kills Allen, then such killing, if committed under the immediate influence of sudden passion, such as anger, rage, resentment or terror, rendering his mind incapable of cool reflection, arising from an adequate cause, would not be of a higher grade than manslaughter."

The objection was, that the charge eliminated self-defense, and was prejudicial because defendant had not denied that he killed deceased under the immediate influence of sudden passion; denied, that he had provoked the difficulty, and claimed that he acted in his own necessary self-defense.

On self-defense, the court charged the jury as follows: "Therefore, if, in this case, the defendant killed F. S. Allen, he was justifiable in so doing if he did so to prevent Allen murdering or inflicting serious

bodily injury upon him, the defendant, providing it reasonably appeared to the defendant from the acts, or by the words coupled with the acts of Allen, that it was the purpose and intent of Allen to murder or to inflict serious bodily injury upon the defendant, and providing the killing took place while Allen was in the act of murder or of inflicting serious bodily injury upon the defendant, or after some act done by Allen, showing evidently an intent to murder or to inflict serious bodily injury upon him, the defendant.

"But you are further charged in this connection, that if the defendant by his own wrongful act brought about the necessity of killing Allen, or provoked a difficulty with the apparent intention of taking the life of Allen, intentionally, and with a view thereto, and that under such circumstances he shot and killed Allen, then defendant's plea of self-defense will not avail him, and the killing would be murder in the first or second degree, as the facts and circumstances may justify you in finding."

It was objected to this charge, that it omitted to instruct the jury, that the danger might be only apparent and not real, to constitute ground of self-defense. And, it was further objected, that this charge, in connection with the charge upon provoking the difficulty, was susceptible of the construction that any wrongful act would deprive defendant of his right to defend himself; and it is urged further, that the requisites of the wrongful act that would compromit the rights of self-defense are not clearly stated so there could be no misconstruction.

The charge was further excepted to, because it failed specifically to instruct the jury upon insulting words towards a female relative; and defendant requested a special instruction upon this point, as follows: "You are instructed, that if prior to the shooting of deceased by defendant, the deceased called the defendant a 'mother-fucking son-of-a-bitch,' and the defendant, on account of said language and under the immediate influence of sudden passion caused thereby, if any, shot and killed the deceased, then you are instructed, in such a case, the defendant could not be guilty of a higher offense than manslaughter, if guilty of anything."

*W. A. Wright, Sims & Snodgrass* and *W. E. Oxford*, for appellant.—As to error of the court in permitting the examination of the witness, Brown, and permitting him to be asked leading questions, they cited, Ray v. State, 36 S. W. Rep., 446. And, that such mode of examination was inadmissible under provisions of Art. 755, Code Crim. Proc., cited, Thomas v. State, 14 Tex. Crim. App., 70; Bennett v. State, 24 Tex. Crim. App., 77; Erwin v. State, 32 Tex. Crim. Rep., 520; and that the witness could not be thus corroborated by proof of previous statements; cited, Bailey v. State, 9 Tex. Crim. App., 98.

The State, to maintain the issues on its part, while the witness for the State, Bige Freeland, was on the stand, asked said witness, over defendant's objection, the following question:

Q. "Didn't you make this statement on the examining trial: 'I didn't hear Allen call the defendant a mother-fucking son-of-a-bitch, nor did I hear any voices from the poker room use that term. I could hear Allen say, you are another.'"

To which witness answered, over defendant's objection, as follows: "Yes, I made that statement."

To which defendant objected because (1) leading, (2) not original evidence, (3) not proper to bolster up a witness' statement by proving what he had previously testified to.

The court qualified said bill of exception as follows: "2. As to bill No. 3, the witness, Freeland, was not asked on his direct examination as to any former statements made by him, but upon cross-examination, defendant's counsel having in his hand the testimony taken on the examining trial, and without showing witness his written testimony, read a portion of the same to witness, and asked him if he so testified at the examining trial. State's counsel, upon re-examination, asked said witness if he did not also testify as shown in bill of exception, reading from the same testimony which was admitted by the court as being a part of the same statement about which he was interrogated by defendant's counsel, and necessary to a full understanding of witness' said testimony."

From this statement of the court, it would seem that he regarded the question and answer objected to by defendant as being admissible under the rule set forth in Art. 751, Code Crim. Proc. That is, the testimony objected to, says the trial court, was admitted as being a part of the same statement about which witness was interrogated by the defendant's counsel, and necessary to a full understanding of witness' said testimony. Defendant had drawn out no part of such a statement.

If the court had stated in his qualification of this bill of exception what was the part of the witness' testimony taken before the examining court that defendant's counsel interrogated the witness about, then this court would have some data from which to determine whether the testimony objected to was a part of the same statement inquired about by defendant, and necessary to an understanding thereof; and defendant ought not to be bound by this conclusion of the trial judge, when from a statement of the facts which led him to admit the evidence objected to, this court might arrive at a different conclusion. We cannot believe, under the rule announced in Ball's case, 36 S. W. Rep., 448, that the trial judge's qualification of the bill of exception should weaken its force, and if not, then very clearly the question was leading, the answer should not have been admitted as original evidence, and it was not proper to bolster up the statement of the witness by proving what he had previously testified to.

"The court erred in permitting the State, while the defendant, John H. Fitzpatrick, was on the stand in his own behalf, to ask, upon cross-examination, the following questions, and receive the following answers, to-wit: Q.—Have you ever been indicted or arrested upon affidavit for

assaulting any one else in the last few years?   Were you ever indicted
for an assault upon Mr. Blanchard with a six shooter?   A.—I was in-
dicted for carrying a six shooter.   Q.—Were you indicted for striking
Blanchard?   A.—I never struck Blanchard.   Q.—Were you indicted
for assaulting or striking at him with a six shooter?   You were charged
with assaulting him with a six shooter, wasn't you ?   A.—I don't think
I was.   Q.—Were you arrested for assaulting?   Do you know a boy by
the name of Farley?   A.—Yes.   Q.—Is he here?   A.—Yes, I think
so.   Q.—Crippled boy, aint he?   (Here the defendant excepted to the
question with reference to the boy being crippled, and saved bill of ex-
ceptions to the question.)   A.—Yes.   Q.—Were you arrested for as-
saulting him with a six shooter?   Further, have you been indicted in
the last year or two for an assault upon a man by the name of Harry
Farley?   A.—No, sir; it was a simple assault.   Q.—About a year ago?
A.—Yes.   Q.—Were you charged with an assault upon Ernest Ogden
in the County Court of Tom Green County?   A.—No, sir.   Q.—Have
you been arrested upon an indictment by the grand jury, or upon a
warrant before the justice of the peace, or County Judge, for an assault
upon anyone else besides those names who I have called?   A.—I don't
remember any others.   Q.—Do you know Albert Goss?   A.—Yes, sir;
I was arrested with fight with him in the Justice of the Peace Court.

To each and all of which said questions and answers the defendant
at the time interposed objections, because the same did not relate to any
felony, and were not misdemeanors involving moral turpitude, and the
court should grant the defendant a new trial for said evidence in not
sustaining said objection.   Said improper conduct by the State in elicit-
ing the said testimony from the said Fitzpatrick, being clearly calcu-
lated to put in issue the defendant's general character by the State,
when defendant had not put said character in issue.

Since the case of Lights v. State, 21 Tex. Crim. App., 308, over-
ruling Ivy's case in 41st Texas, it has been well settled in this State
that a witness may be asked, for the purpose of attacking his credi-
bility, if he has been accused of an infamous offense, or if he has been
arrested for a crime involving legal and moral turpitude.   Jackson v.
State, 33 Tex. Crim. Rep., 287.

Evidence of collateral misdemeanor for the purpose of attacking a
witness' credibility has always been limited to those involving legal
and moral turpitude.   See case, Williford v. State, 36 Tex. Crim. Rep.,
414; Lige Brittain v. State, 36 Tex. Crim. Rep., 406; Good v. State,
32 Tex. Crim. Rep., 505.

In the Williford case, above cited, this court says:   "Over objection
the State was permitted to prove that defendant had been twice fined in
Justice's Court for fighting.   It is competent to prove that a defendant
has been convicted of felony or of misdemeanors imputing moral turpi-
tude.   Mere assault and battery doesn't carry such imputation."

In the case of State v. Smith (Mo. Sup.), 28 S. W. Rep., 182, Gantt,
Presiding Judge, says: "But conviction of a mere assault and battery

is not admissible to impeach a witness. It does not affect his general moral character." See, also, Cable v. State, 31 Ohio State, 100; Arhart v. Stork, 27 N. Y. Sup., 301; State v. Taylor, 98 Mo., 240; People v. Carolin, 12 Pac., 52; Amer. and Eng. Ency of Law, Vol. 29, pp. 810 and 811.

The court erred in refusing to give defendant's special requested instruction in regard to manslaughter based upon insulting words towards a female relative.

The deceased called the defendant a mother-fucking son-of-a-bitch just preceeding the fatal shot.

Our contention is, that the use of these words comes within the meaning and intendment of Subdiv. 4, Art. 597, relating to insulting words towards a female relative. It was a direct charge that the defendant had coition with his mother. The testimony of defendant shows the effect the language had upon him, and that it did produce such a degree of anger as to render his mind incapable of cool reflection. The testimony of all the other witnesses corroborate him as to the condition of his mind at that time. In Escareno v. State, 16 Tex. Crim. App., 91, the Mexican word "cabron" was held to be insulting language towards defendant's wife, the admitted meaning of the word being "a man who consents to his wife's prostitution." There is this distinction, as we think, between the case at bar and the Escareno case, and the case of Graham v. State, 33 S. W. Rep., 537. In the Graham case, the language was that defendant would fuck his mother, etc.; not had or was so doing, the court holding in that case that the insult was aimed directly at defendant, the defendant having offered the first insult, "and deceased in response told him he was base enough to prostitute his mother." In the case before us, the deceased gave the first insult. Levy's case, 28 Tex. Crim. App., 203; Richardson's case, 28 Tex. Crim. App., 221.

*C. H. Jenkins, J. W. Hill* and *Mann Trice,* Assistant Attorney-General, for the State.—The State submits that the matters complained of, in appellant's bills of exceptions Nos. 2 to 7, inclusive, are not properly before this court, and cannot be considered, for the reason that the said bills of exceptions are not authenticated by the signature of the trial judge, or otherwise. The record shows that this cause was on trial from May 7th to 11th, 1896. Bills of exceptions Nos. 2 to 7, inclusive, appear to have been filed on May 11th, 1896, but neither of them are signed by the presiding judge. Subsequently, on May 19th, 1896, and on a separate sheet from the bills of exceptions, is filed what purports to be the judge's allowance and qualification of said bills of exceptions Nos. 2 to 7, in which he allows said bills of exceptions, with the explanations therein stated. And to this paper the judge's signature is attached. Is this a bill of exceptions; or can a bill of exceptions be so authenticated? We think not.

A bill of exceptions to be entitled to consideration by the court must

be prepared, authenticated and filed in the manner required by the statutes and rules.  Willson's Code Crim. Proc. (New), Art. 724; Rev. Civ. Stat. (1895), Arts. 1360 to 1369; Rules District Court, No. 55, 20 S. W. Rep., 15; Owens v. State, 4 Tex. Crim. App., 154; Hill v. State, 10 Tex. Crim. App., 673; Exon v. State, 33 Tex. Crim. Rep., 461.

A bill of exceptions must be authenticated in one of two ways: either by the official signature of the judge who tried the case, or by the bystanders, in the manner provided by statutes.    Rev. Stat., Arts. 1367, 1368 and 1369; Willson's Code Crim. Proc. (New), Art. 725 and note 5, and authorities cited; Lindly v. State, 11 Tex. Crim. App., 283; Knight v. State, 7 Tex. Crim. App., 206.

It was not error to compel the defendant to answer upon cross-examination as to assaults committed by him within the last two years upon other parties.

This is a different question from that of impeaching a witness by proof of other crimes committed by him.    This can be done only by putting in evidence the record of conviction of felony or other infamous crime. Thompson on Trials, Sec. 535.    But a different rule prevails on cross-examination.    Thompson on Trials, Sec. 465; Reul v. People, 42 N. Y., 280.    In the above case this difference is fully discussed.

When the defendant goes upon the witness stand he is to be treated as any other witness.    Mendez v. State, 29 Tex. Crim. App., 608; State v. Satinon, 13 N. W., 634.

The jury being the exclusive judges of the credibility of the witness, ought to know his surroundings and status, so as not to give one belonging to the criminal class the same credit as to him whose character is above reproach.    Carroll v. State, 32 Tex. Crim. Rep., 434.

In Burkett v. New Jersey Steamboat Co., it was held admissible upon cross-examination of defendant's watchman, who was charged with assault, to show that he was quarrelsome, as affecting his character.    18 Fed. Rep., 156.

That a witness has been drifting about from place to place (a tramp), and that he has been living in unlawful cohabitation with a woman, and that a witness fights and shoots craps, may be shown upon cross-examination, as affecting their credibility.    Hollingsworth v. State (Ark.), 14 S. W. Rep., 41.

In State v. Row, it was held proper to ask a witness as to his recent place of residence, though the answer may show that he has been in jail, and evidently in this case, a misdemeanor.

In Pfefferle v. State, 12 Pac. Rep., 407, on a trial for illegally selling liquor, held proper to ask the witness if he was not an old saloon keeper, and if he had not recently been convicted for illegally selling liquor.

In Wroe v. State, 20 Ohio, 460, it was held proper to compel a witness to answer that he had been discharged from the police force; that he was under indictment for murder and had pleaded guilty to the indictment for assault and battery.

In Hanoff v. State, 37 Ohio, 179, upon trial for assault with intent to kill, held proper to ask defendant, on cross-examination, if he had not pleaded guilty to an indictment for an assault with intent to kill, and if he had not frequently been arrested for assault and battery.

In Hamilton v. State, 25 Mich., 183, held proper to ask a witness if he had not deserted, and if he had not been charged with crime (the nature of the crime not stated).

In William v. Flood, 16 Mich., 40, the court says, not to allow a witness to be questioned as to his antecedents is based upon falacious reasoning, which in nine cases out of ten would prevent an honest witness from obtaining better credit than an abandoned ruffian.

It is insisted that the witness could be asked only as to felonies and misdemeanors involving moral turpitude. But any wilful violation of law is a crime. Can there be such a thing as a moral crime? "Whosoever shall keep the whole law and yet offend (wilfully) in one point is guilty of all." He is not a law-abiding man, and the jury ought to know it when he offers himself as a witness.

If it was error to compel defendant to answer as to the recent commission of misdemeanors by him, it was not reversible error.

This court has held that it was error to cross-examine the defendant as to misdemeanors not involving moral turpitude. See, Goode v. State, 32 Tex. Crim. Rep., 509; Lige Brittain v. State, 36 Tex. Crim. Rep., 406, and Williford v. State, 36 Tex. Crim. Rep., 414. But this court has not held that it would reverse a case for this error. There was other errors in each of these cases.

The erroneous admission of evidence is not one of the causes for which the court must reverse a case. We take it that the question is upon the whole case, is it reasonable that the verdict would have been otherwise but for the admission of the evidence complained of.

In LeBeau v. People, 34 N. Y., 234, the witness for the State was an accomplice in the murder of her husband, testifying against her paramour. She was asked if she had not had carnal intercourse with other men. An objection to this question was sustained. This was clearly error. But the court said: "Such evidence would not have added anything to her moral degradation." Which is equivalent to saying, though the evidence was admitted, the verdict would not have been different, and therefore it is not reversible error.

In State v. Evans, 14 S. W. Rep., 118 (Mo.), the court says it was error to refuse to allow a witness called to impeach another to ask if he had not contributed money to assist in the prosecution. But as the witness was otherwise impeached without contradiction, the error is immaterial.

In State v. Howard, 14 S. W. Rep., 938, a confession under arrest was admitted over defendant's objection, but as the confession was only as to the identity of defendant as the party who did the shooting, and as this was admitted, it was held to be harmless error.

The extent of the cross-examination of a witness is largely in the dis-

cretion of the court. Pfefferle v. State, 12 Pac., 408. (The question is fully discussed in this case.) See, also, Hanoff v. State, 37 Ohio, for full discussion.

Hollingsworth v. State (Ark.), 14 S. W. Rep., 41, evidence upon cross-examination tending to impeach a witness should be rejected with great caution. LeBeau v. State, 34 N. Y., 234.

DAVIDSON, JUDGE.—Appellant was convicted of murder in the second degree, and given twelve years in the penitentiary; hence this appeal. There is nothing in appellant's assignment as to the order of court changing the venue from Tom Green County to Erath County. The ground urged is that the order does not show that it was done at a regular term of the District Court of Tom Green County. It has been held that the transcript for the change of venue need not include the caption, showing the term of court at which the order of change of venue was made. See, Wolfforth v. State, 31 Tex. Crim. Rep., 387. The law fixing the time of holding the District Court of Tom Green County, in force at the time, authorized the said court to be begun and holden on the fourteenth Monday after the first Monday in September, which, in the year 1895, came on the 9th day of December, and authorized said court to continue in session until the business thereof was disposed of. The order for the change of venue in this case was made on the 8th day of January, 1896. The indictment was returned into the District Court on the 10th day of December, 1895. On this showing of the record, this court will certainly indulge the presumption that the District Court of Tom Green County met, as authorized by law, on the 9th of December, 1895, and the session was continued until the 8th of January, 1896, when this order for the change of venue was made. The State insists that the bills of exception in the record numbered from 2 to 7, inclusive, should not be considered, because they were not approved by the judge as required by law, but that they were approved, some nine days after they were filed, on a separate piece of paper, by the judge who tried the case. This approval, filed by the judge, was during the term, and within ten days after the trial was concluded. The judge's approval alludes to each of the bills seriatim, and to a number of them he affixes an explanation before signing. While the statute requires a bill of exceptions to be approved and signed by the judge, we know of no rule of law or decision that requires the bill of exceptions and the approval of the judge to be written on the same sheet of paper. Of course, this would appear to be the more regular procedure—that each separate bill be signed by the judge. If the bills of exceptions are made out on separate slips or sheets of paper, and afterwards attached and fastened together with pins or brads, in such case, we think there would be no question, if the bills of exceptions are numbered and alluded to in the judge's approval, that it would be sufficient approval of each of said bills. The record in this case does not show that said bills and the approval were not so fastened together. The judge's approval rather indicates

that such was the fact, as it alludes to each of the bills, inclusive, from
two to seven, and approves the same. However, we would not be
understood as holding, although the bills were not so attached and fastened
together, if the judge's certificate of approval referred to and identified
said bills as the bills approved and signed by him, though such approval
was on a separate sheet of paper, that it would not be a good approval of
the bills of exception. We think the maxim would apply here. "Id
certum est quod certum reddi potest." While the State's witness, John
Brown, was on the stand, over the appellant's objection, the State
asked him the following question: "Did you make this statement
on the examining trial?" 'When the defendant called him (mean-
ing Allen) a lying son-of-a-bitch, Allen said, "I didn't care, if you are
standing in together; I did not mean anything." ' " To which witness
answered, "Allen said, 'I didn't mean anything.' " To the question and
answer, and before the same was answered, defendant excepted "(1) be-
cause the same was leading; (2) not original evidence; (3) not proper to
bolster up the statement of a witness by proof of what he had previously
testified to. In explanation to the bill, the court certifies "that the wit-
ness, Brown, had omitted the statement complained of in detailing the
occurrence. His manner indicated that he was an unwilling witness for
the State. State's counsel asked him if his memory had not been re-
freshed by reading his testimony over to him the night before, and that
if he had not then been asked if it was correct, and if he wanted to cor-
rect the same by any additions or omissions; and he answered that it had
been read over to him with that statement, and he had stated that it was
correct. His testimony was then shown him, together with his signa-
ture, and he was asked if he made the statement as contained in the bill
of exceptions. Upon objection by the defendant's counsel, State's coun-
sel stated that they believed that said witness would answer as stated in
his original testimony, and were surprised at his failure to do so; and
the court regarded said witness as unfriendly to the State, and that
State's counsel did not ask him questions on the stand merely for the
purpose of contradicting him, and admitted the question as shown by
said bill." The court's explanation that the witness appeared to be un-
friendly authorized the court to allow leading questions; this being a
matter largely within the discretion of the court. With regard to the
use of the record by the State's counsel in the examination of the wit-
ness, unquestionably, if this record had been called for by the witness
for the purpose of refreshing his recollection about the fact, and the wit-
ness could say it would serve such purpose, he would have been afforded
the opportunity of examining it. See, Hubby v. State, 8 Tex. Crim.
App., 597; White v. State, 18 Tex. Crim. App., 57; 1 Thomp. Trials,
p. 364, § 402, Subdiv. 3; State v. Miller, 53 Iowa, 154, 4 N. W., 900.
But in this case it appears that the witness was an unfriendly and an
unwilling witness, and in such case it was permissible for the court to
authorize his being treated by counsel, in the examination, in this re-
spect, as an adverse witness; and, in order to elicit the fact, he could

be cross-examined, and means could be used to refresh his memory, and to challenge his recollection of the facts. It seems in this case, on being so refreshed by the record, the witness stated that Allen said, on the occasion in question, that he did not mean anything by saying that the defendant and Harris were standing in together, or in his (Allen) calling defendant a son-of-a-bitch. This, as we understand it, was not stating what he had testified to previously, as corroborative of his testimony then being given, but was the statement of a fact which was pertinent, after his recollection had been refreshed; and this, we think, was legitimate. With reference to the objection to the examination of the witnesses, Freeland and Brazil, in connection with the record of a former trial, the court's explanation shows that the testimony in connection with this record evidence of a former trial was first brought out by the defendant; and on re-examination by the State, the remainder of said witness' testimony, in connection with that brought out by the defendant, was allowed to be adduced by the State as explanatory of what had been theretofore introduced by the defendant. This, as we understand it, was permissible. And we think it was permissible to show by the witness, Brazil, in connection with his testimony (he having already testified as to the relative positions of the defendant and the deceased at the time of the fatal rencounter, and his own position) that he saw no demonstration on the part of the deceased at the time or shortly before the time he was shot; that he was in a position to have seen any demonstration on the part of the deceased, as if to draw or present a pistol, if he had done so; and that he saw no such demonstration. This was a shorthand rendering of the facts.

On the trial the defendant was a witness in his own behalf, and, over the objections of the defendant, the State was permitted to prove by him that he had been indicted and convicted for a simple assault upon a man named Harry Farley, and that he had been arrested in the Justice of the Peace Court for fighting with Albert Goss. Defendant objected to this testimony, because these were not convictions for felonies, but are mere misdemeanors, which do not involve moral turpitude. They were not legitimate for the purpose of impeaching the defendant, and could only serve to prejudice the jury against the defendant. We do not deem it necessary to go into a discussion of this question or the authorities bearing upon it. The question is settled in this State that such testimony is not admissible. See, Goode v. State, 32 Tex. Crim. Rep., 505; Brittain v. State, 36 Tex. Crim. Rep., 406; Williford v. State, 36 Tex. Crim. Rep., 414; State v. Smith (Mo.), 28 S. W. Rep., 182; Cobel v. State, 31 Ohio St., 100; Arhart v. Stork, 27 N. Y. Sup., 301; State v. Taylor, 98 Mo., 240; 11 S. W. Rep., 570. The further question remains, however, that, notwithstanding this impeaching testimony should not have been admitted, was it of a character, under the record in this case, to injure or impair the rights of the appellant? This involves the question whether or not appellant's testimony as to the facts attending the killing was materially variant or differ-

ent from that of the other witnesses who testified in this case. All
the witnesses, both for the State and the appellant, show that the diffi-
culty which resulted in the homicide occurred over a game of cards.
The defendant and the deceased, with one or two other parties, were
engaged in a game of poker, in a poker room over the corner saloon, in
San Angelo, Tex.; the killing occurring between 12 and 1 o'clock at
night. During the game, appellant proposed to divide the pot with one
Harris. Harris remarked that he could not do it, as there was another
party in the game who had not passed out; alluding to Allen, the de-
ceased. The deceased thereupon threw his hand (cards) down, stating
that defendant and Harris were in together anyhow. This was resented
by the defendant, and an altercation ensued in the poker room, which
appeared to have been cut off from the main or larger gambling room,
being in one corner thereof. Appellant and the deceased, according to
the witnesses, quarreled and bandied epithets with each other for some
time in the room. Some of the witnesses say deceased called defendant
a "mother f—g son-of-a-bitch" first; others, that the appellant called
the deceased that first; and some that they did not know who used
the expression first. Defendant himself says that deceased applied this
epithet to him, but he did, not use it towards the deceased. All of the
witnesses testify, and so does the appellant, that they called each other
"damned sons-of-bitches" repeatedly; and a number of witnesses testify
that this character of expression was common between these parties,
who associated together a good deal, and nothing seemed to be thought
of it between them. About this time, defendant left the poker room,
went out into the gambling room, thence downstairs into the saloon, and
asked for his gun or pistol. The bartender told him that he had given
him his pistol when he went on duty. Defendant went back upstairs
and got his pistol, where he had placed it against the wall, near his
coat, when he began the game of poker. Some of the witnesses say
that, when the defendant asked for his gun downstairs, he said he
"would not allow any God damn man to impose on him that way,
and he would kill him." One of the witnesses stated that he said he
"was going to shoot him; that they could not accuse him of robbing."
The defendant, in his own testimony, says that he did not remember
anything that occurred after the deceased called him "a mother f—g
s—n-of-a-b—h," until he found himself down in the bar room asking
for his gun. When the defendant came back into the poker room it
appears that the deceased and several others were still in the room. The
witnesses for the State show that the defendant began the altercation
again when he got his pistol. The defendant himself says that, when
he came back and got his pistol, he said, "Frank, you can't make
me do nothing," or "You can't do nothing with me." Accord-
ing to some of the witnesses, Allen (the deceased) told him that
if he would put his gun down he would whip him, and then
the altercation began again. Freeland testified that he heard de-
fendant tell Allen to go and get his gun, and he would wait for

him.   After they had abused each other here for some time, it seems
that the parties in the room, according to the testimony of eye witnesses,
as well as the defendant himself, caught the defendant, and shoved him
out of the poker room.   Some of the parties prevailed on Allen to go,
and he came out of the poker room; the parties still quarreling.   In a
short time it appears that Allen started as if to leave the difficulty, and
went to the stair steps and started down the steps, and had gone down a
few steps, saying nothing; and at this juncture, according to the testi-
mony of all the witnesses, the defendant stepped up to a point near to
the stair steps.   According to several, defendant reached over the steps,
and touched the deceased, and accosted him.   Brown testified that he
said, " 'Tankey, you ain't game to fight me,' and made a move towards
Allen, but did not know whether he touched him or not—a move like
he was reaching to touch him.   Allen then turned around and said, 'I'll
fight you any way,' and I think called defendant a 'son-of-a-bitch.' Allen
stepped back up the stairs, and Fitzpatrick backed south of the poker-
room door.   I then got out of the way, and did not see the shooting."
Killiman testified that "Allen did not say a word, as he remembered, as
he walked to the steps.   Defendant got to Allen by the time he got to
the stairway, and slapped him on the shoulder, and said, 'Tankey, old
boy, you ain't got nerve to fight; go on downstairs.'   Allen then turned
around, and stepped back upstairs.   Runion, the constable, was with
Fitzpatrick at this time, and had hold of him, trying to get him back.   As
Allen turned around, he said, 'Don't you put your hands on me, you God
damned son-of-a-bitch; I can whip you any way men ever fought,' and
turned with his hands hold of his (Allen's) coat.   Defendant pushed
Runion off and said, 'I am mad; I will kill both of you,' and raised his
gun, and shot Allen; and Allen clasped his hands to his breast, whirled
around, and caught the banisters, and, as he did that, Fitzpatrick shot
him in the back.   Allen fell."   Runion testified "that he and Fitzpat-
rick were some twelve or fifteen feet away from the head of the stairs,
and he had hold of Fitzpatrick when Allen started down stairs.   Fitz-
patrick walked over to the head of the stairs, and told Allen that he was
a cur, and would not fight anything.   Allen told Fitzpatrick that he was
a damn liar; that he would fight him anywhere.   Allen came back then,
and he (Runion) shoved Fitzpatrick back towards the crap table.   Fitz-
patrick shoved witness away, and said, 'I'll kill both of you,' or he
would kill both of us, and pulled his pistol, and fired.   After the first shot,
Allen threw his hands up to the place where he was shot, and halloaed,
'Oh!' and another shot was fired, and he fell."   Talbert and Brazil
testified to the same effect as to the conduct of the parties at this
juncture, but they did not hear the expressions of defendant, but heard
the defendant say something to deceased, and Allen turned around, and
said, "I'll fight you any way in the world."   As Allen turned around,
the defendant retreated a few steps, and Runion stepped in between
them.   Defendant got back, drew his pistol, and, as Allen advanced,
defendant shot him.   All of these witnesses concur in stating that they

saw no motion or demonstration on the part of Allen as if to draw a pistol. Some of them testified that he might have made a demonstration, and they not have seen it; and others, that they were watching the parties, and no demonstration of that sort was made; and they showed how the deceased was holding his hands at the time. On this point the defendant testified as follows: "After I came back in the poker room and got my pistol, I turned around and said, 'Frank, you can't make me do nothing,' or 'You can't do nothing with me.' I was on one side of the poker table and he was on the other. I just motioned towards him with my hand, and about that time Brown or Runion shoved me back, and I fell against some chairs, or rather, sat down. When I got up, I think I had the gun in my hand. They shoved me out of the door, and, after I got out of the door, I put the gun back in my pants, either in my waistband or hip-pocket; don't know which. We then abused one another back and forth. He was in the poker room, and I was on the outside. He came out of the poker room, and started towards the head of the steps, and we were still abusing each other. He stepped about middle ways between the head of the steps and the poker room door, and abused me, and walked on towards the head of the steps. Runion had hold of me all this time, before and after Allen came out. After he started down the steps—I think it was about two steps from the banisters—I stooped over, and threw my right hand on the banisters, and I says, 'Go on, God damn you; you won't fight anyhow,' or maybe, called him a 'son-of-a-bitch.' We were both calling each other sons-of-bitches. He turned around, and came back up the steps, and, after he got upon the steps, or rather, after he got on the landing, he stepped away two or three steps sideways. He said, 'You God damn mother f——g son-of-a-bitch, I'll fight you any way on earth.' Runion had hold of me still, and took me towards the crap table. When deceased used this language, he threw his hand to his hip pocket, and I threw Runion off, and says, 'Turn me loose; he will shoot us both,' or 'will kill us both;' and, just as I threw Runion off, I pulled the gun out, and fired two shots." Defendant then proceeds to tell that his mother raised him— that he lived with her until she died, at which time he was 17 years of age. He also testified, in this connection, "that this epithet hurt him very much, and made him awful mad and excited; and from the motion deceased made I thought he was going to shoot any minute. I knew that he always had a gun on at night. I saw him with a gun when we first went in the poker room that night. When Allen used to me the epithet above, I did not reply in the same terms. I called him a 'damned pot-bellied son-of-a-bitch,' and at this juncture I shot the deceased. When I fired at Allen, he had his hands back, as if he was going to draw a gun. I could not tell what he did after I fired the first shot, on account of the smoke. I cannot say whether I would have killed him or not, if he had not made a move towards drawing a pistol. I cannot say why I did not kill him after I came back and got my gun, after he had called me the epithet stated above." Some of the witnesses for the

37th Tex. Crim. Rep.—3.

defendant testify that a pistol was found on the body of the deceased after his death. Except as to the epithet applied by the deceased to the defendant, just before the shooting, and also the demonstration just before said shooting,. we fail to see that appellant's testimony is materially different, in the essential points of the homicide, from that of the other witnesses in this case. All concur with him to the effect that the deceased was leaving the place of the difficulty —had gotten a part of the way downstairs—when the defendant followed him up, and, according to some of the witnesses, made an assault upon him; according to others, and his own testimony, challenged him to a combat with deadly weapons. We can place no other construction than this on the acts and conduct of the appellant as testified to by himself. Deceased was going downstairs, leaving the place of the difficulty. ·Appellant went to him, and taunted him, telling him, " 'Go on, God damn you; you won't fight anyhow,' or maybe I called him a 'son-of-a-bitch.' " No matter what had transpired before, this was a provocation on the part of the appellant, and a renewal of the difficulty. If, as he states, deceased was armed with a pistol, defendant himself knew that he also had a pistol, and previously, during the difficulty, had manifested repeatedly a disposition to use it. Although the court gave a general charge on manslaughter, in our opinion, there was no manslaughter in this case—neither under a general provocation calculated to produce passion in a person of ordinary temper, nor because of the alleged epithet applied by the deceased to the defendant. As was said . in Graham v. State (Tex. Crim. App.), 33 S. W. Rep., 537,. this was merely an insult to the defendant himself, and not in the nature of a slander or insult towards a female relation. The evidence of the appellant in this case clearly and unmistakably shows that at least the killing was upon implied malice. It may be that the defendant was not cool and deliberate, so as to form the intent to kill upon express malice. The altercation may have produced, as he says, "hot blood and excitement" on his part; but unquestionably, after the deceased abandoned the altercation, and was leaving the place, defendant followed him, produced the occasion, and made the provocation, evidently for the purpose either of killing the deceased, if he resisted it, or, on his acceptance of the challenge, to engage with him in a deadly conflict with weapons, in which the life of one or both might be sacrificed. Of course, the defendant's evidence puts a milder light on the killing than that suggested by the testimony of the other witnesses. His evidence alone showed a demonstration on the part of the deceased when he was taunted with his cowardice and challenged to fight; but this, under the circumstances, did not reduce to manslaughter, much less justify the killing. The jury, if they had believed the other witnesses, and had disbelieved the defendant as to any demonstration, would no doubt have given the defendant a much severer punishment than that of confinement in the penitentiary for twelve years; and doubtless, in fixing the penalty in this case, they considered the fact that the killing was not in the nature of an assassin-

ation, but was a killing on an occasion produced and sought by the slayer, in which he thought his adversary was fighting him upon fair terms. We can see no other reason why they should have given him the small amount of punishment which they did. What we have heretofore said disposes of the other questions raised by the appellant on the charge of the court, and the refused special instructions asked by the appellant. We do not believe the court made too prominent the question of a killing on provocation in this case. We do not believe the court erred in refusing to give the charge asked on manslaughter, predicated upon an insult to a female relative. The other errors need not be discussed. The judgment is affirmed.

*Affirmed.*

[NOTE.—Defendant's motion for rehearing was overruled without a written opinion.—Reporter.]