## KYE HAYMAN v. THE STATE.

### No. 3015.  Decided November 16, 1904.

#### 1.—Manslaughter—Charge of Court—Insult to Female Relative.

Where the opprobrious epithet, "God damn black bastard son of a bitch" was addressed to defendant by deceased, it was held not to be a reflection upon the latter's mother, so as to require a charge on manslaughter, based upon this language as adequate cause.

#### 2.—Same—Self-Defense—Too Restrictive.

Where the evidence showed that the deceased was about to attack defendant, at the time of the homicide, with a rock in one hand and an axe in the other, it was error to confine the charge to a threatened attack with an axe.

#### 3.—Same—Cooling Time—Question of Fact.

Where on a trial for murder, the evidence showed that only a short time before defendant killed deceased, the latter had struck him with a plank three inches

wide, an inch thick and three or four feet long, and which was calculated to produce pain, and consequent rage, anger or resentment; the question of whether sufficient time had intervened between this blow and the act of killing to have rendered the defendant's mind capable of cool reflection was one of fact for the jury under appropriate instructions.

Appeal from the District Court of Leon.   Tried below before Hon. J. M. Smither.

Appeal from a conviction of murder in the second degree; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

No brief for appellant.

*Howard Martin,* Assistant Attorney-General, for the State.

DAVIDSON, Presiding Judge.—This conviction was for murder in the second degree, the penalty fixed at five years confinement in the penitentiary.

Deceased was shot on the inside of his own yard by appellant on July 7th, 1904.   There had been some previous trouble and ill will between the parties, and deceased (Brown) had forbidden appellant to come on his place.   On the day of the homicide, and shortly before that occurrence, appellant stopped at the residence of deceased to speak to his mother, who was visiting at deceased's.   When defendant got off his horse and started in through the gate into the house, the wife of deceased told him not to come in as Mr. Brown did not want him on the place.   Defendant remarked he was a little man, but covered the ground he stood on; that he wanted some water, and would go and get the keys.   His mother had the keys.   Defendant got the drink of water, sat down on the gallery and was talking to his mother, remaining some ten or fifteen minutes.   Deceased was cutting weeds at the back of the house.   After appellant had been at the house some ten or fifteen minutes, deceased came into the yard with a piece of plank in his hand, about three inches wide, an inch thick and three or four feet long.   Deceased remarked to appellant, "You think you can run over me?"   Then hit defendant on the head with the plank, and remarked to him, "See that gate?   Hit it."   Defendant went out of the yard, picked up his axe, got on his horse without saying anything, and rode off in the direction of his home.   About fifteen or twenty minutes afterwards this witness saw appellant coming up through the field with a gun.   She called her husband's attention to this fact.   He quit his work at once, picked up his axe, and started towards the yard gate rapidly, remarking that he was not afraid of defendant, his guns, his pistols or his bowie knives.   Just as defendant got outside the field gate, deceased said, "Get back, you God damn son of a bitch, or I will kill you."   Appellant stepped back inside the field, and then came back out of the field.   Deceased said, "Shoot, you God damn son of a bitch, if you miss me you are my meat."   Defendant remarked, "You are

my meat," and fired. At this time deceased was standing at the yard gate with his left hand on the gate, and his right hand on the handle of the axe—the axe being on the ground, his hand on the end of the handle. Appellant was in the habit of passing defendant's house when he was at work in the bottom getting ties and posts, and passed there often. It was his nearest way to his place of work. The parties lived a half to three-fourths of a mile apart. The daughter of deceased testified practically as did her mother. It was shown that the evening prior to the difficulty the witness Paggitt stopped at the house of deceased to get a drink of water, and deceased seemed to be very much excited, and cursed and abused defendant. This seems to have grown out of the fact that deceased thought appellant was connected with the elopement of his daughter and her marriage to a young man named Byrd. He said that appellant permitted the meeting of these young people at his (appellant's) house. It was also admitted that deceased told Craig Paggitt, and another party, a few days before the homicide that he intended to kill appellant, calling him a God damn black son of a bitch. This threat was communicated to defendant. It seems to have been a conceded fact that appellant was below the average in intelligence. Appellant testified in his own behalf; that he stopped at the residence of deceased to get the keys from his mother to get into his house to get his dinner. He says he did not want to go into the yard because Brown desired his absence, and he did not want any trouble himself; that Mrs. Brown invited him to get down and get a drink; that he did not see Brown about the place when he got down; that he did get off his horse, got a drink, and obtained the keys from his mother. That Mrs. Brown (wife of deceased) began talking to him about their daughter's elopement and marriage. He remarked to her that he thought her daughter had done very well; that Byrd was a good boy and would take care of her. During this conversation deceased came into the yard with a piece of rail in his hand, and remarked to appellant: "I thought I told you to stay off of my premises." And pointed to the gate, and said, "God damn you, hit it." Just as he remarked that he struck me with the piece of rail, just below the temple on the side of the head. The blow staggered me, but I said nothing; went to the gate, picked up my axe, got on my horse and went home; and as I rode off, Mr. Brown said to me, "You God damn black son of a bitch, if you come back this way I will kill you." He says he went home, ate his dinner, rested a little while, loaded his gun with duck-shot (some call them buck-shot) and started back to Grayson's Mill, where he was at work to see if a certain party had gotten a saw so they could start to sawing next morning. "When I got to the field gate, near deceased's house, I got off my horse, unlatched the gate, dropped the bridle reins and started to fasten the gate,—when I heard deceased say, 'Go back, you black son of a bitch, if you come by here I will kill you.' I went back into the field and started out to catch my horse and go on. Just as I latched the gate, I saw Mr. Brown, about six feet from his yard-gate,

and about thirty feet from me. He said, 'Shoot, you God damn black bastard son of a bitch.' He had a rock in his right hand and an axe in his left hand. He was moving his arms, and said, 'I will kill you with this rock and chop you up with this axe.' When he drew back his right arm as if to throw the rock, I raised my gun and fired off-hand. The rock was a white rock, and would weigh about one-half pound. I killed Mr. Brown because I thought he was going to kill me, by striking me with the rock and running on to me with the axe, and cutting me with it." Only one shot was fired. The gun was a single-barrel shot-gun. He says he would not have taken the gun with him if Brown had not threatened to kill him. This is the substance of the facts adduced.

It is contended that the court erred in not submitting the issue of manslaughter, in regard to the expression used, "God damn black bastard son of a bitch," insisting that this language is a reffection upon his mother's virtue and an insult to a female relative. We do not agree with this contention. It was intended as an insulting remark to deceased, but evidently not a reflection or intended reflection upon his mother. Simmons v. State, 23 Texas Crim. App., 653; Levy v. State, 28 Texas Crim. App., 203.

The court submitted the issue of self-defense based upon a threatened attack with an axe. Exception was reserved to this charge because it selected the axe and omitted the rock testified about by appellant; that he had the same right to defend against the attack from the rock as from the axe, and the charge was too restrictive. We are of opinion that this contention is correct; that he did have the same right to defend against a threatened attack with a rock as from the axe.

The charge is also criticised because the court omitted to charge the jury with regard to "cooling time." The State's witness showed that some fifteen or twenty minutes before the fatal meeting, deceased had inflicted a blow with a plank three inches wide, an inch thick, three or four feet long, upon the head of defendant. Defendant says the time was longer than fifteen or twenty minutes, but appellant was gone only a short time as evidenced by the facts above stated. Upon another trial the jury should be properly instructed with regard to this matter. A plank of this size or rail, as testified by defendant, used in the manner testified by the witness was calculated to and doubtless did inflict pain. Cooling time is a question of fact and not of law. If the killing occurred immediately upon striking the blow, it would unquestionably have been adequate cause to produce anger, rage, resentment, etc. If he was enraged by this at the time, and the jury believed his mind had not cooled sufficiently to contemplate his action: in other words, if his mind was still enraged so that it was incapable of cool reflection, it would constitute adequate cause, and cooling time being a question of fact it should have been submitted to the jury under appropriate instructions.

For the errors indicated the judgment is reversed and the cause remanded.

*Reversed and remanded.*