### L. W. Gay v. The State.

No. 21. Decided December 15, 1909.

Rehearing denied March 9, 1910.

**1.—Murder—Evidence—Defense of Property—Forcible Ejection—Trespasser.**

Where, upon trial for murder, the evidence showed that the defendant had purchased an improved piece of land from the State's witness, and had agreed with said witness that the deceased should take the place of a tenant on said land, there was no error in permitting said State's witness to testify that he agreed to this arrangement. Moreover, even if the deceased was a trespasser on defendant's said land, the latter had no legal right to forcibly eject him,

and after deceased refused to vacate said place to shoot and kill him; as defendant's ownership did not authorize him, in the protection of his property, to take human life.

**2.—Same—Evidence—Bill of Exceptions—Qualification by Judge.**

Where, upon trial for murder, the court qualified the defendant's bill of exceptions with reference to the introduction of testimony, and which qualifications were accepted by the defendant, he will be bound by the recitals in such explanation.

**3.—Same—Evidence—Self-Serving Evidence—Bill of Exceptions—Practice on Appeal.**

Where, upon trial for murder, defendant sought to show by his wife that he had endeavored to employ counsel to dispossess deceased, some time before the homicide, to which the State objected on the ground that this testimony was self-serving; and the bill of exceptions did not show the materiality or relevancy of such testimony, the same could not be considered on appeal.

**4.—Same—Evidence—Sub-lease—Motion to Strike out Evidence.**

Where, upon trial for murder, the evidence showed that the defendant had purchased an improved piece of land, and had agreed with the vendor that the deceased should occupy one of the tenant houses in place of the tenant who was on the place at the time of the sale to defendant; but defendant claimed on the trial that he had not made such arrangement and that the first tenant had no authority to sublet, and therefore moved to strike out the State's testimony, there was no error in overruling said motion.

**5.—Same—Charge of Court—Landlord and Tenant—Subletting—Trespasser.**

Where, upon trial for murder, the State's theory was that the deceased lawfully occupied defendant's land as a tenant at the time of the homicide, and that defendant killed him in the act of forcibly ejecting him; and defendant's theory was that the deceased obtained possession from a former tenant without defendant's consent and was therefore a trespasser, there was no error that the court refused defendant's requested charge that the deceased was a trespasser; inasmuch as defendant had no right to kill deceased even if he was a trespasser.

**6.—Same—Charge of Court—Mitigating Circumstances—Trespasser.**

Where, upon trial for murder, the court sufficiently guarded defendant's rights as to mitigating circumstances in his charge on manslaughter, there was no error in refusing requested charges that the deceased was a trespasser on defendant's land at the time of the homicide, even if such charges raised the question of extenuating circumstances.

**7.—Same—Charge of Court—Self-Defense—Deadly Weapon—Apparent Danger.**

Where, upon trial for murder, the evidence of the defense showed that the deceased and his brother moved upon defendant, and that deceased sought the advantage of a tree with his right hand on his hip pocket, and the said brother also had his right hand on his hip pocket, and defendant believed they were going to shoot him, there was no error in the court's charge that if either was armed, and the weapons used or the manner of their use by the deceased or his brother was such as was reasonably calculated to produce death or serious bodily injury, then the law presumed that they intended to kill or inflict serious bodily injury; although the testimony showed that deceased and his brother were unarmed.

**8.—Same—Charge of Court—Manslaughter.**

Where, upon trial for murder, the evidence did not raise the issue of manslaughter by reason of insulting conduct towards the wife of the defendant, there was no error in the court's failure to charge thereon.

**9.—Same—Sufficiency of the Evidence.**

Where, upon trial for murder, the evidence sustained a conviction of murder in the second degree, the same will not be disturbed on appeal.

Appeal from the District Court of Grimes. Tried below before the Hon. S. W. Dean.

Appeal from a conviction of murder in the second degree; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*J. G. McDonald* and *Carl T. Harper* and *K. P. Jones* and *W. W. Meachum,* for appellant.—On question of court's charge on self-defense: Hjeronymus v. State, 46 Texas Crim. Rep., 157; Burnett v. State, 51 Texas Crim. Rep., 20. On question of court's failure to charge on insulting conduct of deceased towards defendant's wife: Clanton v. State, 20 Texas Crim. App., 615; Niland v. State, 19 Texas Crim. App., 166.

*F. J. McCord,* Assistant Attorney-General, for the State.

DAVIDSON, Presiding Judge.—Appellant was convicted of murder in the second degree, his punishment being assessed at five years confinement in the penitentiary.

The evidence in brief discloses that Floyd sold to appellant an improved tract of land. On this land were two houses, one occupied by Floyd and the other by Wood Hooker, a tenant of Floyd. At the time of the execution of the deed from Floyd to appellant there was a verbal contract with reference to the time of the delivery of possession of the property and was part of the consideration for the sale and purchase. To avoid this delay appellant made a trade with Floyd in which, for certain inducements, he obtained an earlier delivery of possession of one of the houses. Appellant desired to occupy the house from which Floyd was moving, Hooker was to remain in the other house, which was some 150 or 200 yards distant across a little creek or branch. Floyd reserved certain crops out of the trade, which were not included in the purchase of the land, over which Hooker had control, as Floyd's agent or tenant. Appellant agreed to all this and Hooker remained in the house and in charge of said crops. Perhaps the record is a little confused in regard to Hooker, and it may be well enough to state that Hooker bought these crops from Floyd and was to remain in possession until the crops were gathered, and occupy that particular house he was then occupying until the contract with Floyd was carried out. Later Hooker desired to substitute deceased, Del Gossett, in his contract with Floyd. Del Gossett was, under that proposition, to take the place of Hooker in regard to the entire obligation. Floyd testifies in this respect as follows: "I made it agreeable with Wood Hooker to stay in the house where he was. I told Wood Hooker I would make it agreeable for him to stay in the house down there. He consented to that. Dr. Gay moved in there knowing that Wood Hooker was down there and consenting that Wood Hooker could occupy the house out there until the crop was gathered. That was the

trade of possession between me and Gay. Wood Hooker afterwards sold that crop to Del Gossett. He told me that he did. Hooker wrote to me and told me that he sold the crop afterwards to Del Gossett. I made a trip up there to see Gossett or Hooker about my crop. I think it was somewhere about the middle or the latter part of August that I went up there. Del Gossett's family and Hooker and Taylor's family were there living in the house when I left there. . . . I accepted Del Gossett as the payee of the obligation that Hooker owed me. I accepted him in the place of Hooker for the payment of the crop." This witness further testified that when appellant moved in he knew Wood Hooker was in the house, and consented that Wood Hooker should occupy the house until the crops were gathered. As before stated, Del Gossett was in possession of the house by virtue of a trade with Wood Hooker, which trade and obligation was indorsed by Floyd, who accepted Gossett in lieu of Wood Hooker in the trade with reference to the crop and premises which had been reserved by Floyd with appellant's consent. On the `morning of the difficulty, which ended in such a tragic manner, appellant was sick, or, at least, complaining, and requested his wife to go over to the house where Gossett was and demand possession of it by the following Monday. Mrs. Gay went and delivered the message as requested by her husband. In regard to this particular matter Mrs. Gay testified as follows: "I went over there to Mr. Gossett's that day to ask him if he wouldn't move, and he got mad right straight because I asked him. I did not go over there for any trouble at all. I have nearly forgotten what I said to him and what he said to me. The reason that I went over there was because the doctor asked me if I wouldn't go. The doctor was sick. He asked me to go over there for the purpose of asking Del if he wouldn't move so we could have the house. When I got there I asked him if he wouldn't move, and that we wanted the house by Monday evening. Arthur Gossett was also there. He said that he did not want to move, and that there was not any law that could put him out. There was some further conversation between him and me. He asked me if I come over there to take the doctor's place, and I told him when the doctor was sick I tried to attend to his business the best I could. I believe I have forgotten what they said then. When he said that, there was some other conversation, but I forget what it was. He jumped out of the house and asked me if I was going to take Gay's place, and my husband called me, and they turned their attention to him, and one of them said, "Let's get our guns," and they both run back in the house, and were *rumling* around there a few minutes, and come out holding their hands back of their pants like they had pistols, and I hollered to my husband, and told him they were going to kill him, and they both followed me, and they were cursing him. Del (deceased) got to a mulberry tree about twenty-five or thirty yards, and maybe further. He was still cursing my husband when he got to the tree; he just stood there and cursed him. He called him a God-dam-short-bastard-son-of-

a-bitch. By that time I was right at my husband." Without narrating
further the details of this immediate transaction, it was at or about
this juncture appellant shot and killed Gossett, some of the shot enter-
ing the mulberry tree at which deceased was standing. Arthur Gossett,
brother of deceased, who was with him at the time, tells the story this
way: "My brother was living there on that place at that time, and
he left there and went over on the railroad to get a job working on
the railroad, and he didn't have any team to move with, and he got
a job and he come after me to go and move him, and I had a yoke of
steers, and I taken my wagon to go and move him; and before we
got to Dr. Gay's house, there was a road that turned off to go to Mr.
Tobe Shaddick's, and he (Del) said, 'We will leave our wagon here,
and go up to the house and cook dinner, and while you are packing
up the things I will go over to Mr. Shaddick's and get some hogs that
I have there,' and I said 'alright,' and as we went up to the house we
met a darkey, Brooks, by name, I believe, and Dr. Gay's little boy,
and my brother asked the darkey was Mr. Shaddick at home,. and he
said, 'Yes, sir.'" Without going further into the details of this
matter, the deceased and his brother Arthur went into the house and
were cooking dinner when Mrs. Gay, wife of appellant, came upon the
scene. He says when Mrs. Gay came she said, "Oh, Del," and then
he, witness, told his brother that Mrs. Gay was calling him; that she
said, "Good-morning, Del," and he said, "Good-morning;" that there-
upon she said, "I came to tell you that you are going to have to move,"
and he said, "I am going to do that now," and she said, "You will
have to get out by Monday morning." That his brother said, "That
is my business here now," and she said, "If you don't get out you
will get in trouble;" that his brother, deceased, said, "Who is attend-
ing to the doctor's business?" and Mrs. Gay said, "I am when he is
not able," and asked deceased how he got in through the gates; that
his brother told her they were standing wide open, and she said,
"That is some of Jim Taylor's work;" that deceased said he did not
know about that; that about that time they, witness and deceased,
heard Dr. Gay say, "You God-dam-son-of-a-bitch, are you going to
get out of my house?" That they could not see the doctor from where
they were; that there was a smokehouse between them and the doctor;
that deceased walked out of the door and witness went behind him;
that deceased went around the smokehouse to see Dr. Gay, and the
doctor was still cursing them when they got there; and that he, wit-
ness, said, "Don't curse us that way; you are cursing me for a son-of-a-
bitch;" that the doctor said, "Who are you?" That he, witness, told
him, and he said, "Yes, God-dam you, I will curse you, too;" that
by that time his brother, deceased, had gotten to a mulberry tree;
that deceased had both of his hands up, and said to Mrs. Gay: "I
will ask you as a lady to go to the house and let me and the doctor
talk," and then Doctor Gay shot deceased with a shotgun. He says:
"I run around the corner of the house, and I looked back and saw

my brother sinking down, and I run and started to him, and I asked the doctor could I go to him, and he said I could, and I asked the doctor, and I said, "Not for my sake, nor for his sake, but for the sake of his wife and two little children, can't you come and do something for him?" and he said, "No, the God-dam-son-of-a-bitch, I think I have done a plenty," and he turned and walked off." The evidence is further to the effect that neither the deceased nor his brother Arthur were armed. There had been ill will between the parties in reference to deceased's occupying this house and deceased had asked some parties to intervene and compromise the matter between the appellant and himself, which was declined by appellant. Among other things, it was shown that appellant bought several padlocks and locked the different gates by which egress and ingress could be had to and from the house; and it is further shown that these gates, or at least one of them, had been broken down, and one of the gates was that referred to by Mrs. Gay in the conversation with the deceased about which she remarked that "that was Jim Taylor's work." Jim Taylor had previously been one of the occupants of the house about which the trouble arose. The testimony is very voluminous and we deem it unnecessary to go into a narration of all the details. In fact, it is so voluminous that it can not well be detailed in an opinion.

1. The first question for revision is suggested by the terms of bill of exception No. 1, which is as follows: "While the witness for the State, Ed. Floyd, was testifying, and the State had previously proven that he had sold to defendant, L. W. Gay, by warranty deed the premises in controversy upon which the house stood, about the rightful possession of which the controversy arose, culminating in the homicide, in which no reservations were made, the State of Texas, in order to show that said Del Gossett was in the rightful possession of said house, asked the witness for the State, Ed Floyd, 'Did you accept Del Gossett as the payee of the obligation that Hooker owed you? Did you accept Del Gossett in the place of Wood Hooker for the payment of the crop?' To which the witness replied: 'Yes, sir.' To which question and answer the defendant objected, because he, the said witness, Ed Floyd, having parted with the title to that land by deed, it would not be binding on the defendant, L. W. Gay, who was then the landlord, whether the said Ed Floyd accepted Del Gossett as the payee of the obligation that Wood Hooker owed Floyd for the payment of the crop, on the place or not; and said evidence was therefore immaterial and injurious to defendant." The court qualifies this bill as follows: "That Ed Floyd never parted with the legal title to any part of the premises; on the contrary, retained a vendor's lien, and actually retained possession till his crop should be gathered and sold and delivered the possession with the knowledge and acquiescence of Dr. Gay, and the crop and possession were delivered to Del Gossett by Wood Hooker with the consent of Ed Floyd and with the acquiescence of Dr. Gay." We are of opinion that the ruling of the court was correct;

at least, it was not erroneous, the matters having been stated in regard to these various changes and contracts; so it will be understood that Hooker was in possession of the property and the crop retained by Floyd with the consent of Gay, and as one of the considerations, moving Floyd to turn over the possession of one of the houses earlier than had been previously agreed upon. It was distinctly understood that Hooker was to remain in possession until the crops were gathered. It is further made to appear sufficiently by the facts, and clearly by the qualification to the bill of exceptions, that the trade between the deceased and Hooker was by consent of Floyd and with the acquiescence of appellant. This would seem to settle the question so far as this bill of exceptions is concerned; but whether this were true or not, whether deceased was in possession with or without the consent of appellant, we are of opinion that the testimony could not have injured him, conceding that he was in the house without the acquiescence of appellant. Under neither supposition or theory could appellant go upon the premises and eject Gossett by force, as was sought to be done. Appellant would not be authorized to take a shotgun and go to the place, under the circumstances, and seek to forcibly eject deceased. He was not defending his premises under our statute which authorizes the owner or occupant of premises to defend his property, or his habitation. Under that statute the defending party must be in possession. Gay was not in such possession, under the circumstances, as would justify him in going upon the premises in the manner in which he went. Article 680 of the Penal Code reads as follows: "When, under article 677, a homicide is committed in the protection of property, it must be done under the following circumstances: 3. If possession be once lost, it is not lawful to regain it by such means as result in homicide." We are of opinion, therefore, that under any view of the case this testimony was admissible. The matter was understood by all the parties, appellant included. He had discussed the matter, and on one or two occasions had gone far enough to investigate the question and discuss legal proceedings to put Gossett off the premises. If Gossett was wrongfully on the premises and was a trespasser in fact, he was in possession of the house and appellant had no right to eject him in such manner as to bring about a homicide. It may be further stated in this connection that appellant, having accepted the bill of exceptions with the qualification appended by the trial judge, he will be bound by the recitals in the explanation. If he was not satisfied with the bill as given him by the judge, it devolved upon him to prepare and prove a bill of exceptions which was satisfactory to himself. Having accepted the bill, as qualified, he would be bound by these recitals which placed Del Gossett in possession of the house with his acquiescence. There was no error committed by the court in this connection.

2. Another bill was reserved which recites that while Mrs. Annie Gay was testifying as a witness for the defendant, and after she had testified that she was the wife of the defendant; that she had not

given Del Gossett permission to go on the place; that her husband had not given him permission to go on the place; that her husband had been sick a good while, and that her husband had just prior to the date of the killing of Del Gossett been to Anderson to see Col. Meachum. The defendant, for the purpose of proving that said defendant had tried to begin legal proceedings to evict the said Del Gossett from said premises, asked her the following questions as a part of the res gestae: "What was the purpose of his going? Did he say what he left home for?" Answer: "Yes, sir." "What was that for, and what caused him to go to see Col. Meachum?" To which question the witness would have replied: "He said he wanted to see Col. Meachum, who was a lawyer, and get out papers to have Del Gossett removed from the place by law." On objection by the State this testimony was excluded. The grounds of the State's objection were, first, that it was not the best evidence of why he went to see said Meachum; second, that said Meachum should testify to what Gay said to him at the time; and, third, that said evidence was hearsay and self-serving. The object and purpose of seeking to introduce this evidence is not stated in the bill. Where testimony is offered by the accused and is excluded by the court the object and purpose of offering the testimony must be stated in the bill. See Buchanan v. State, 24 Texas Crim. App., 195. It is a rule well settled in this State that bills of exceptions to the exclusion of testimony will not be considered by the Appellate Court unless the materiality and relevancy of such testimony is made to appear. Cline v. State, 34 Texas Crim. Rep., 347; Adams v. State, 35 Texas Crim. Rep., 285; Ford v. State, 40 Texas Crim. Rep., 280, 51 S. W. Rep., 937; Duffy v. State, 41 Texas Crim. Rep., 391, 55 S. W. Rep., 176; McAnally v. State, 57 S. W. Rep., 832; Brown v. State, 43 Texas Crim. Rep., 293, 65 S. W. Rep., 529. There are a great many other cases that might be enumerated. These are sufficient. The bill is therefore not sufficient to present any supposed erroneous ruling.

3. Another bill recites that before the argument of counsel had begun, defendant filed his written motion to exclude from the jury all testimony introduced by the State through the witness Floyd and other witnesses for the State in regard to any lease, rent, or permission to occupy said house or said premises subsequent to the date of the deed of conveyance to said L. W. Gay from said Ed Floyd and wife on the 8th of July, 1905, because on said day Floyd ceased to be, and Gay became the landlord on said premises and Wood Hooker, if he had been renter under said Floyd, could not subrent said premises to the subtenant Gossett without the consent of said Gay, because of the provision of article 3250 of the Revised Statutes. This motion was overruled and a bill of exceptions reserved. In this action of the court there was no error. As stated in a previous portion of the opinion, the evidence clearly raised the issue that Gossett was in possession of the property with the acquiescence of appellant, and under authority

of Floyd, in regard to the matters and contracts between appellant and Floyd. This testimony was clearly admissible under the circumstances and there was no error in introducing it in the first place, and, of course, there would not be error in refusing to exclude it from the jury.

4. Charges were requested by appellant in effect that the jury would not regard Del Gossett as the tenant of Gay because if they should find that he was in the house with the consent of Floyd, in accordance with the terms of article 3250 of the Revised Civil Statutes, which provides that where lands or tenements are rented by the landlord to one person, or persons, such persons are prohibited from renting or leasing the lands or tenements to another person without obtaining the consent of the landlord, and that under these circumstances deceased could not justify his possession of the house or any part of said premises under the rental contract with Wood Hooker, or anyone else without the consent of Gay, and if the jury should find such possession of the deceased was by virtue of such contract with Hooker, without the consent of Gay, such possession was illegal and said Gossett was a trespasser and would have no lawful right to withhold the possession thereof from appellant. Another instruction was asked and refused in regard to the legal effect of the deed from Floyd and wife to appellant. We are of opinion that these charges were correctly refused. The illegality of the possession of Del Gossett, if true, would not authorize appellant's going upon the place to forcibly eject deceased, and in going upon the premises and killing Gossett. Appellant would have no legal right under these circumstances to kill Gossett, or to use force in ejecting him. Whether a trespasser or not, he was in the actual possession of the house, and if it be conceded that he was a trespasser, then appellant's authority to dispossess him would be circumscribed by the laws of the State which require him to dispossess such trespasser under the terms of the law. The possession under one refused charge and the legal title under the other would not amount to a justification. The question with reference to the extenuating or mitigating circumstances, if these facts are to be so regarded, was sufficiently guarded by the court in the charge on manslaughter.

4. The court gave quite a lengthy charge in reference to self-defense, and, among other things, thus charged the jury: "Or if from the evidence you believe the defendant killed the said Del Gossett, but further believe that at the time of so doing the deceased and his brother, Arthur Gossett, or either of them, had made or were making an attack on the defendant, which from the manner and character of it and the relative strength and numbers of the parties, and the defendant's knowledge of the character and disposition of the deceased and of his brother, or either of them, caused the defendant to have a reasonable expectation or fear of death or serious bodily injury, and that acting under such reasonable expectation or fear the defendant killed the deceased, then you will acquit him, and if the deceased and his brother,

or either of them, were armed at the time the deceased was killed, and were making such attack on the defendant, or if from the standpoint of the defendant at the time, it reasonably appeared to him, the defendant, viewed from his standpoint, that the deceased and his brother, or either of them, were armed at the time, and that they were making or about to make an attack on the defendant, and if the weapons used by said parties, or either of them, and the manner of its use was such as was reasonably calculated to produce death or serious bodily injury, then the law presumes that they intended to murder or aimed to inflict serious bodily injury upon the defendant." The latter part of this charge, to wit: "And if the weapons used by said parties, or either of them, and the manner of its use was such," etc., is criticised as being incorrect and as being upon the weight of the evidence. It is also claimed that it was immaterial whether the weapons were deadly or not so it reasonably appeared so to the defendant; that said defendant had the same right to defend himself from apparent danger as from actual danger, and as applicable to the evidence adduced; that it was immaterial whether the Gossetts had any arms at all, so it reasonably appeared to the defendant that they had. We are of opinion that these exceptions were not well taken. The court sufficiently instructed the jury that if from the defendant's standpoint at the time it reasonably appeared to him that the deceased and his brother, or either of them, were armed at the time and that they were making or about to make an attack upon him, that he would have a right to defend himself, and if the weapons used, or the manner of their use were such as were reasonably calculated to produce death, then the presumption of the law was that the deceased and his brother intended to kill or inflict serious bodily injury. It occurs to us that this charge fully protected appellant's rights and indeed was favorable to him. It is true that the deceased and his brother were not armed, as shown by the testimony, but the evidence introduced by the appellant was to the effect that they moved upon him, and deceased was seeking the advantage of a tree with his right hand on his hip pocket and that his brother also had his right hand upon his hip pocket, which led appellant to believe that they were going to shoot him. We think the court sufficiently guarded the legal rights of appellant in regard to this matter.

5. Exception was reserved to the court's charge also, because it failed to charge the jury the law applicable to manslaughter on account of insulting conduct towards his, appellant's, wife. We have stated the evidence detailed by Mrs. Gay and that by the other eyewitness, Arthur Gossett. We are of opinion that this does not raise the issue of manslaughter by reason of insulting conduct towards the wife of appellant.

6. It is also claimed that the verdict of the jury is unsupported by the evidence. We have stated enough of the testimony to indicate in a general way the status of the case before the jury. We believe this evidence fully justified the jury in arriving at the conclusion that

appellant was guilty as found by their verdict. We wish to say in a general way that an inspection of the charge shows that it fully, in our judgment, protected the legal rights of appellant in submitting the legal issues to the jury. There is considerable testimony that might be summed up in the case showing appellant's ill will towards deceased, and his qualified threats to kill him if deceased did not move from the place, which we deem it unnecessary to set out.

Believing there is no reversible error in the record, the judgment is affirmed.

*Affirmed.*

[Rehearing denied March 9, 1910.—Reporter.]