### Alvino Trevino v. The State.

No. 2766.   Decided November 19, 1913.

**1.—Murder—Manslaughter—Charge of Court—Insulting Language.**

Language that defendant was the son of a whore and disgraced is not such insulting language towards a female relative as contemplated by the statute; and there was no error in the court's failure to charge thereon in his charge on manslaughter. Following Fitzpatrick v. State, 37 Texas Crim. Rep., 20.

**2.—Same—Self-defense—Charge of Court—Unnecessary Force.**

Where, upon trial of murder, the evidence did not call for a charge requiring defendant to resort to all other means for the prevention of such injury, etc., the same was reversible error.

**3.—Same—Charge of Court—Defense of Another.**

Where, upon trial of murder, the evidence raised the issue of defense of another, the court's failure to charge thereon was reversible error.

**4.—Same—Charge of Court—Intent to Kill.**

Where, upon trial of murder, there was no evidence that the instrument used was a deadly weapon, and there was evidence that defendant did not intend to kill, the court should have instructed the jury to acquit the defendant of homicide if they believed under the circumstances that he had no intent to kill.

**5.—Same—Continuance—Special Venire—Practice on Appeal.**

Where the case was reversed on other grounds, the question of overruling the application for a continuance and to quash the special venire need not be considered.

Appeal from the District Court of Bexar. Tried below before the Hon. W. S. Anderson.

Appeal from a conviction of murder in the second degree; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*Dwyer & Dwyer* and *Chambers & Watson,* for appellant.—On question of court's failure to submit intent to kill: Hill v. State, 11 Texas Crim. App., 456; Thompson v. State, 24 id., 383; Boyd v. State, 28 id., 137; Grenshaw v. State, 48 Texas Crim. Rep., 77; Williams v. State. 61 id., 356; Shumate v. State, 38 id., 266.

On question of court's failure to charge on defense of another: Voight v. State, 53 Texas Crim. Rep., 268.

*C. E. Lane,* Assistant Attorney-General, for the State.

DAVIDSON, Judge.—Appellant was convicted for killing Brigido Gaudino by cutting him with a knife, his punishment being assessed at five years confinement in the penitentiary.

The statement of facts, in substance, shows that appellant and Martinez lived near what is called the First Mission below the City of San Antonio. Martinez owned a buggy and a mule. In the evening he hitched this mule to the buggy and he and appellant drove into the City of San Antonio, to a wagon yard, took the mule from the buggy, leaving the harness on the mule, and hitched the animal. They went thence to a saloon and drank two or three schooners of beer. From that point they went to what they called a sporting house and danced with the girls. After dancing a while they concluded to return home, and went to the wagon yard to hitch their team. In the wagon yard somewhere this trouble occurred. The witnesses differ as to the place and circumstances. Some of the State's witnesses testified they heard a scuffling by some men behind a water tank and heard a lick. The parties scattered and went away. Martinez turned State's evidence and his case was dismissed and his testimony used. After giving an account of where he lived, and the distance from the city, he narrates the fact that on the evening of October 12, 1912, he was with defendant, who went with him in his buggy to San Antonio. He was driving a mule. He went to the camp yard of Fernandez on Matamoras and Santa Rosa Streets, reaching there before dark. They unhitched the mule from the buggy, and tied it in the camp yard but did not take the harness off. They went to a sporting house and danced with the girls, staying there until about seven o'clock. There they met Vidal Aguilar, who also danced with the girls; thence they went to a saloon directly in front of Fernandez's store. He says that the three, defendant, Aguilar and himself, remained about fifteen or twenty minutes in the saloon and had two or three rounds of beer, smoking cigarettes in the meantime. They left the saloon, went to the camp yard and hitched up the mule with a view of going home. The three left the saloon at the same time and in the following order: "I led the way; Vidal Aguilar was next, and Alvino Trevino, the defendant, was third. We entered Domingo Fernandez's camp yard in this same order. It was dark at that time, and about 7:30 o'clock in the evening. I passed some one in the camp yard, but do not know who it was, because I could not recognize him on account of the darkness. I went on to where the mule was, to hitch her up, and the defendant came up and said he had cut some one. Vidal Aguilar went on ahead of us out of the camp yard, and the defendant and I hitching up the buggy, drove out of the camp yard in a different direction to what we drove in, and went on towards home. After going

a piece, we caught up with Vidal Aguilar, and he got in the buggy with us. We then drove slowly down South Flores Street, until we reached the depot, where we were stopped by some police officers, who arrested us, and we were brought back to town, and placed in the city hall, all three of us. . . . I saw the defendant strike the person I passed this way (illustrating as one would thrust with a knife). It was after we had left the camp yard and picked up Aguilar that the defendant said, 'I cut him.' " On cross-examination he says he made a trade with the State by which he was to be immuned from punishment on condition he testify. This witness contradicts the State's witness Dunbar about some matters that occurred which we deem unnecessary to state. The defendant testified practically as did the witness Martinez as to their place of residence, going to the city, dancing with the girls, drinking beer and going to the wagon yard, and the order of their going. He then states: "On passing through the camp yard I heard some one say, 'Are you Antonio Martinez?' and Antonio Martinez replied 'no,' whereupon the party grabbed· ahold of him and then began to scuffle, and I thought ·he was trying to rob Antonio Martinez, as he had his arms around him, and I rushed up to where he was, after having opened up my knife, to see what he was doing to my companion, Antonio Martinez. When I got there, which was in a few seconds, I put my hand on his shoulder and said, 'What do you mean?' and he turned and let go of Antonio Martinez and cursed me, in Spanish (which is omitted, but which translated in English, he says, means) saying that 'I was the son of a whore and disgraced,' and at the same time he drew some dark object from his waist, which I took to be a pistol, and he then made towards me, when I cut him with my pocket knife to defend myself. The deceased then went one way and I went the other, and I went to the buggy and told Antonio Martinez I had cut this man. We then hitched up the mule and got in the buggy. Vidal Aguilar had gone on ahead. We drove out in another direction than which we came in, and went on towards home. This was about half past 7 o'clock at night. I did not know the deceased, and if I had it was too dark for me to recognize him. I do not remember ever having seen him before. I did not intend to kill him, but simply cut him in defense of myself, and to keep him, as I thought, from shooting or killing me, or doing me serious bodily harm. I could have cut him several times more, if I had so desired, but when he retreated after having been cut by me, I went my way and he went his. I did not know that he had been badly cut, or how badly he was cut, until told afterwards when I was in jail." He describes the trip down South Flores Street until arrested by the officers as did the witness Martinez. The evidence shows that deceased and defendant were both boys under twenty-one years of age, and but little difference in their ages.

The court gave a general charge on manslaughter, telling the jury they might look to all the facts and· circumstances to determine the question of adequate cause and consequent passion in passing upon the

case. Objection was urged that the court should have submitted the insulting language used which applied to defendant as being the son of a whore and disgraced. Under case of Fitzpatrick v. State, 37 Texas Crim. Rep., 20, the court was not in error.

In submitting the issue of self-defense, the court gave the usual charge in this respect. After giving this charge he further charged the jury as follows: "Homicide is justifiable in the protection of the person against any other unlawful and violent attack besides one with intent to murder, or to inflict serious bodily injury, and in such case all other means must be resorted to for the prevention of the injury, and the killing must take place while the person killed is in the very act of making such unlawful and violent attack." Exception was reserved to this phase of the charge, which exception is well taken. This issue was not in the case. Appellant's right of self-defense arose from his testimony under two views, first, that he was defending himself against apparent danger, that is, that the party whom he cut had drawn a weapon which he thought was a pistol. This presented the ordinary theory of self-defense based upon apparent danger. The second view is, under the defendant's testimony he was entitled to a charge which was not given, and for which exception was reserved, for the defense of Martinez, whom he swears he found attacked by the deceased, and whom he thought deceased was trying to rob. These two issues of self-defense were in the case, and the second phase of it should have been charged as contended by appellant. Therefore, we hold, with respect to this phase of the case, that the court was in error in charging with reference to any other unlawful and violent attack besides one with intent to murder or inflict serious bodily injury, requiring him to resort to all other means for the prevention of such injury, etc., and second, that the court should have charged the jury that he had a right to defend Martinez if he believed at the time Martinez's life was in danger or he was being robbed.

In reference to the failure of the court to charge on insulting conduct towards the mother of defendant, appellant excepted to the failure of the court to so charge and asked special instructions, which were refused by the court. This was not error.

It will be remembered that defendant testfied in connection with the circumstances attending the difficulty, that he used his knife not for the purpose of killing or with the intent to kill but in defending himself against the threatened attack; that he only cut one time and the parties separated. He further testified that he used a pocket-knife. There is no evidence in the record as to the size of the pocket-knife or its dangerous character, or that it was a deadly weapon. To meet this phase of the case appellant requested the court to submit to the jury a charge which would instruct them to acquit him of homicide if they believed under the circumstances that he had no intent to kill. We believe under our statutes that, under the facts of this case, this charge should have been given. It is not shown to have been a deadly weapon,

nor that the wound was inflicted in such manner as showed a cruel or evil disposition, and from any viewpoint of the testimony it was a sudden and unexpected meeting, a difficulty occurring between two boys who were strangers to each other and at night. If the defendant's testimony be true he did not intend to kill deceased. This raised the issue in connection with the other facts. If some of the State's testimony is true, that is, that there was a difficulty or scuffle at the water tank not seen by them, then we have no facts otherwise than the mere fact of the struggle or scuffle, and the fact that a lick was struck. From that viewpoint we have no evidence as to the attendant circumstances. These witnesses did not see the difficulty as it was behind a water tank, and knew nothing about it further than they heard a scuffle and lick struck. From any viewpoint of this case we are of opinion that a charge on intent to kill should have been given.

Application was made for a continuance, which was overruled. Without taking up the grounds of this phase of the record or discussing it, it will be disposed of with the statement that the witnesses may be obtained upon another trial.

There was a motion made to quash the special venire, that is not discussed as it may not occur upon another trial, and will hardly occur as it did upon this trial.

For the errors indicated the judgment is reversed and the cause is remanded.

*Reversed and remanded.*