## H. L. Walker v. The State.

### No. 5635. Decided April 28, 1920.

### Rehearing denied June 25, 1920.

### Rehearing denied March 30, 1921.

**1.—Murder—Insult to Female Relatives—Manslaughter—Charge of Court.**

Where, upon trial of murder, the defendant did not claim that the language he imputed to deceased, angered, enraged, or excited him at all, nor was there anything in said language susceptible of any construction capable. of having that effect and the requested charge of the defendant not pointing out the necessity of submitting this matter to the jury, as a question of fact, there was no reversible error.

**2.—Same—Argument of Counsel—Defendant's Failure to Testify.**

Where, appellant in his motion for new trial for the first time complained of statements in the argument of State's counsel relative to the failure of defendant to testify on his examining trial, and this motion was controverted by the State, and the trial court heard evidence and makes the express finding of fact to the effect that no such statements were made by the attorney for the State, and no abuse of discretion being shown, there was no reversible error.

**3.—Same—Rehearing—Manslaughter—Insult to Female Relative—Charge of Court—Rule Stated.**

Where, the testimony shows the use of language by the deceased concerning the female relatives of the accused, its interpretation is primarily for the trial judge. If, however, the language used is not susceptible of the construction that it was an insult, then it is a matter under appropriate instructions which the jury would be called upon to determine. Following Jones v. State, 33 Texas Crim. Rep., 497, and other cases.

**4.—Same—Case Stated—Insulting Language to Female Relatives.**

Where the language used by the deceased was not obviously within the statute, and at the most was of questionable meaning, and there was no specific request on the part of the defendant to have the jury determine its import; and the charge requested assumed that it was insulting, and was coupled with other matters embraced in the court's charge, which would have been improper to repeat in an instruction to the jury, the court, in view of the record as presented, in refusing to give the requested charge by defendant, or in failing to amend his original charge, upon the suggestion contained in the exception to the main charge and the special charge mentioned, did not commit reversible error.

**5.—Same—Statutes Construed—Requested Charge.**

The statutory law covering the necessity and requirements of a charge to the jury is embraced in Articles 735 to 743, Code of Criminal Procedure, and according to the latter article no judgment shall be reversed unless the error appearing from the record is calculated to injure the rights of the defendant, or that defendant has not had a fair and impartial trial, and all objections to the charge of the court shall be made at the time of the trial.

Appeal from the Criminal District Court of Harris. Tried below before the Honorable C. W. Robinson.

Appeal from a conviction of murder; penalty, death.

The opinion states the case.

*J. Dixie Smith* and *Jno. C. Williams* and *E. A. Berry,* for appellant.—On question of court's charge on manslaughter: Halliburton v. State, 22 S. W. Rep., 48; Gillespie v. State, 109 id., 159; Black v. State, 38 Texas Crim. Rep., 58; Mundine v. State, 37 id., 5; Vance v. State, 34 id., 395.

*Alvin M. Owsley,* Assistant Attorney General, and *E. T. Branch,* District Attorney, for the State.—On question that defendant did not attempt to point out specifically wherein the court erred in failing to give his requested charge on manslaughter: Joseph v. State, 59 Texas Crim. Rep., 84; Kubacak v. State, 59 id., 165; Pollard v. State, 58 id., 307; Duncan v. State, 55 id., 169; Holmes v. State, 55 id., 331.

LATTIMORE, JUDGE.—Appellant was convicted in the Criminal District Court of Harris County for murder, and his punishment fixed at death.

It appears from the record that appellant and deceased, whose name was Ottersky, on the 26th day of April, 1919, went in a car to a place in the woods not far from Houston, and that the body of deceased was found at this place some three days later, with four bullet holes, several of which were in vital places; said body being buried in a shallow grave, and evidence appeared of the fact that said body was dragged to said place from a point some yards distant. At a time, variously estimated at from 1:30 to 2 o'clock on said afternoon, appellant and Ottersky were seen together in said car, the latter being much under the influence of liquor and exhibiting large sums of money and checks. A witness who was at work not far from the scene of the homicide, said that at about 2:30 or 3 o'clock that day, he heard four shots. When the body of deceased was found, his pockets were wrongside out; his money, checks and other valuables, were gone. Four checks payable to deceased were endorsed by appellant, and deposited to his credit on the day of the homicide. The next day after the killing, appellant wrote a letter to the employer of the deceased, in which he spoke of the fact that he feared Ottersky had not enjoyed his visit to Houston, and that Ottersky told him that he had quit the business he was then employed in, and was Mexico bound. Appellant was also seen that same afternoon, driving alone the car in which he and deceased were earlier in the afternoon, and it was testified to by some witnesses that appellant bragged to them of the amount of money he had made that day or week. Altogether, the State placed on the stand a large number of witnesses, who showed the connection between appellant and deceased just prior to the hour

of the homicide, and the possession by appellant of the effects of deceased immediately thereafter. When the State rested its case, appellant took the stand, and admitted that he shot the deceased several times, but claimed that he did it in self-defense. His account of what took place after he and deceased reached the place in the woods where the killing occurred, was, substantially, that they ate a lunch first; then indulged in some drinking and poker playing, until he won all of the money which deceased had, and that when this was done, they were sitting in various positions in the car, and that he said to deceased: "We think we are having a hell of a time, don't we? I wonder where the wife and babies are this evening." That deceased replied, "I don't give a damn where mine is. I reckon you know I am divorced." Appellant said he replied: "All the interest I have got is my wife and babies, and if I close this big deal Monday, I am going to wire my wife at Brownsville—wire my wife to meet me at Woodboro—that is where my babies are in school, and their school was out on Friday, and I am going to bring them to Houston, and make Houston my home from now on. I believe I could do good here." To this appellant says deceased replied: "Why in hell don't you get a divorce from that woman? She don't care anything for you, you know the way everything is." Appellant says he then replied, "What in the world do you mean?" and that deceased said, "By God, you know how you are living, don't you?" and he stated to deceased, "My family affairs haven't got anything to do with you," and that deceased replied, "I guess, by God, it has," and that deceased then kicked him out of the car, and started after him, and that as deceased was getting out of the car with a gun in his hand, he fell, and appellant struck him, and in the ensuing struggle appellant was severely bruised, but said he succeeded in taking the gun away from the deceased, and shot him with it several times. Predicated upon this testimony, appellant asked a charge on manslaughter, as based upon insulting words towards a female relative.

Turning to the record, we find that the court charged on self-defense, and on manslaughter, predicated on an assault and battery, and instructed the jury that in determining the condition of the appellant's mind, they could take into consideration all the circumstances of the case, occurring both at the time and prior thereto. No exception was taken to the charge of the court on self-defense, and the only serious complaint thereof made here, seems to be that the charge did not submit manslaughter as based on insulting words. A special charge on that phase was presented and refused. We think the charge of the court an admirable presentation of the law applicable, unless the failure to charge on manslaughter, arising from the language attributed to deceased, is error.

In every case it is necessary that a demand for the submission of an issue be based on facts in evidence, whose legitimate effect would be to raise such issue. Manslaughter is defined by statute to be an un-

justifiable homicide, committed under the immediate influence of sudden passion, arising from an adequate cause. Appellant did not claim that the language he imputed to deceased, angered, enraged, or excited him at all; nor do we see anything in said language susceptible of any construction capable of having that effect. We have fully quoted from the testimony of the appellant what he said with regard to the occurrences, in order to make this clear. No sudden passion arising from the use of this language caused appellant to hurl himself at the throat of deceased; nor does he appear to have been the aggressor in the fight which he says later took place. On the contrary, he says that he asked deceased what he meant by asking why he did not get a divorce from that woman, and the reply of deceased was, "you know how you are living." Nothing in this seems to have raised any sudden passion on the part of appellant, for he says that he then stated to deceased that his family affairs had nothing to do with deceased, and that Ottersky said they did and attacked him, kicking him out of the car, drawing a pistol, and continuing the assault upon him. We are unable to come to any conclusion but that the trial court properly refused to base any charge on manslaughter upon the ground of insulting words or conduct.

Our law of manslaughter is a legislative concession to the weakness of human nature, in that it recognizes that there are causes which may produce great passion in the heart of a man, and remove from him temporarily the power to reason and calculate the consequences. This sudden emotion does not calculate the relative sizes of men, nor the effectiveness of this or what weapon, or whether now is an advantageous opportunity; but when the occasion offers, the passion masters the man, sweeps him into action, and renders impossible the existence of that mental condition necessary in order to produce malice and deliberation. Apparently to the mind of appellant, and certainly to ours, there was no insult to female relatives in the statement attributed to deceased, and none which roused such sudden passion in his mind, and no manslaughter was predicable thereon.

In his motion for a new trial, appellant for the first time, complained of statements in the arguments of State's counsel relative to the failure of appellant to testify on his examining trial. This motion was controverted by the State, as is permissible under our statute, and upon its presentation, the trial court heard evidence *pro* and *con,* and in his order overruling the motion, expressly makes his finding of fact to the effect that no such statements were made by the attorney for the State in his argument. There seems ample evidence before the court to justify such conclusion, and it is the invariable rule of this Court, and we think a proper one, that in such cases we will not attempt to say what would have been our conclusion, if placed in the position occupied by the trial court, but we will uphold such action, unless there appears a clear abuse of the discretion necessarily confided in the trial court in such matters. We cannot agree to the contention that under this evidence a case of murder is not clearly made out.

We have examined this record at length, and carefully, in view of the punishment meted out to appellant, but finding no error therein, the judgment of the trial court is affirmed.

*Affirmed.*

ON REHEARING.

June 25, 1920.

LATTIMORE, Judge.—Almost the only insistence of appellant in his motion for rehearing is, that it was reversible error for the trial court not to tell the jury in his charge, in so many words, that the language which he attributed to deceased prior to the killing, was adequate cause to produce sudden passion, upon which manslaughter is predicated; and that this Court correspondingly erred in its opinion upholding the action of the lower court. We endeavored to carefully weigh and discuss this matter in our former opinion, in which the language claimed to have been used is fully set out.

This Court has held in many cases that the language used in the particular case then before it, was not insulting so as to make it measure up to our manslaughter statute: Graham v. State, 33 S. W. Rep., 537; Fitzpatrick v. State, 37 Texas Crim. Rep., 20; Simmons v. State, 23 Texas Crim. App., 653; Woods v. State, 71 Texas Crim. Rep., 398; Parker v. State, 24 Texas Crim. App., 61; Trevinio v. State, 72 Texas Crim. Rep., 91.

These cases seem to hold that to call a man a son-of-a-bitch or a son-of-a-whore, is not an insult to a female relative. Calling the accused a "God damn short bastard son-of-a-bitch" seems to have been held, in Gay v. State, 58 Texas Crim. Rep., 472, not to raise the issue of manslaughter, or to call for a charge stating that this is adequate cause. The question as to whether the language used was insulting, seems also to be held one for the court and not the jury.—Morrison v. State, 61 Texas Crim. Rep., 223.

Looking to the language used, how can this Court determine if the same be insulting? It would seem that we might look at it from what appears from the evidence to have been the viewpoint of appellant himself. According to his statements, he replied to the query of deceased, as to "why he did not get a divorce from that woman, that she did not care anything for him," by asking deceased what he meant. This would seem to indicate an attitude of inquiry, and not anger on the part of appellant. In fact, he nowhere claims that the query of deceased in any wise angered him. He testified that he and deceased were on the best of terms, were intimate friends, and were even then out on a sort of picnic, as boon companions. Are we to assume to ourselves the responsibility of putting into appellant's mind a view of the language he clearly does not appear to have entertained? Nor does the reply made by deceased to the question of appellant as to

what he meant, seem to reflect any intent to insult, or show that deceased had intended a reflection on the wife of appellant. Nor did appellant appear to so regard the reply of deceased. He says deceased replied: "You know how you are living, don't you?" Absolutely nothing appears in this to show that it was intended as an insult to the wife, or that appellant so regarded it. He testified that he merely said to deceased: "My family affairs haven't got anything to do with you." Appellant did not then attack deceased, but says that a moment or two later, deceased began the fatal difficulty himself by kicking appellant out of the car, and starting out after him with a pistol in his hand; but that by reason of the fact that the bottom was out of the car, deceased fell as he was getting out, and appellant says he then struck him, and the fight proceeded, appellant getting hold of the pistol of deceased, and shooting him with same four times. We know of no viewpoint from which we would be justified in concluding as a matter of law, that the language used was insulting. In determining this question, it will become necessary to take into consideration the relationship of the parties, and the immediate facts and circumstances surrounding the case; and we confess ourselves unable to find one fact or circumstance in the testimony of appellant which would lead us to think he regarded the language as meriting resentment, because insulting to his wife. A dispassionate analysis of the language *per se,* would lead one to conclude that it is such as might be used by a lawyer to his client, or a friend who knew the life of his friend, or of one to whom another looked for advice, or in jest between friends, or in many others ways easily imaginable, without intending or reflecting any insult whatever. We decline to hold as a matter of law that the language used was insulting, and that the trial court, in refusing to tell the jury that such language was adequate cause, committed an error so grave as to demand at our hands a reversal of this case.

The lower court submitted manslaughter, based on the most plausible theory made by appellant's testimony, to wit: that deceased kicked him out of the car, thereby committing an assault upon him, causing him pain. This was by far the most reasonable and natural theory of manslaughter possible under the circumstances. The loser in a game of cards, inflamed by liquor, might much more be deemed capable of assaulting the winner than of traducing his wife. In common experience, gaming losses and liquor, are not unusual antecedents to brawls and breaches of the peace, but it would seem rarely to lead to slander of the wife of a friend. The trial court not only submitted manslaughter, with the statement that an assault causing pain or bloodshed was adequate cause, but also told the jury that in determining the adequacy of the cause and the sufficiency of the provocation, it was their duty to look to all the facts and circumstances in evidence. The field of manslaughter was thus opened to the jury. They utterly refused to enter. Probably they could not forget the checks payable to deceased which were taken from his person at the time of his death, and later

appeared with his name endorsed thereon by appellant; or it might be that the tourned-out pockets of the mute corpse spoke out too loudly, or that the letter written by appellant, after he had buried deceased, in which he informed a joint employer that deceased did not seem to enjoy his stay in Houston, and told him that he was Mexico bound, —may have conveyed a different meaning to the jury; or perhaps they remembered the grip of deceased, which appellant had shipped off by express, or some of the other numerous facts in this case, or all of them, may have barred the road to the conclusion of manslaughter of a friend in a hasty quarrel, and pointed to that other conclusion, of the murder of a victim for his money. We regret not being able to agree with the contentions so ably urged.

The motion for rehearing is overruled.

*Overruled.*

### ON SECOND APPLICATION FOR REHEARING.

### March 30, 1921.

MORROW, Presiding Judge and HAWKINS, Judge.—The appellant insists that in deciding this case and in overruling the motion for rehearing the court has mistaken the rules of law applicable to the facts; and considering the gravity of the case, we have given attention to the motion of the appellant to have considered his second motion for rehearing.

Our statute on manslaughter declares that "insulting words or conduct of the person killed towards a female relation of the party guilty of the homicide" is adequate cause to reduce the offense to the grade of manslaughter. By reason of this statute, in a case of homicide where there is evidence to the effect that the deceased used toward the female relative of the accused insulting language or conduct, it is incumbent upon the court to instruct the jury in unmistakable terms that such insulting language or conduct would be adequate cause to reduce the mind of the assailant to a state rendering him incapable of cool reflection. Fuller v. State, 54 Texas Crim. Rep., 454; Gillespie v. State, 53 Texas Crim. Rep., 167.

In the case before us, if the language imputed to the deceased by the appellant was insulting language within the meaning of the statute, it was the duty of the court to inform the jury that if used by the deceased, as detailed by the appellant, it constituted adequate cause to reduce the offense to manslaughter. Where the testimony shows the use of language by the deceased concerning the female relative of the accused, its interpretation is primarily for the trial judge. That is to say, he is called upon to determine the import of the language. If given its natural or obvious meaning the language signifies an insult toward the female relative, it then becomes the duty of the court to recognize this meaning in his charge and tell the jury that if the lan-

guage was used or if the appellant was informed that it was used, as the case may be, that adequate cause existed by reason thereof. If, however, the language used is not susceptible of the construction that it was an insult toward the female relative, then it is not the duty of the court to tell the jury that it was adequate cause. This is illustrated by the numerous instances in which it has been decided by the trial judge that language obviously insulting to the accused was not within the statute touching insulting language toward a female relative, and this decision upheld upon appeal. Simmons v. State, 23 Texas Crim. App., 653; Levy v. State, 28 Texas Crim. App., 203; Hayman v. State, 47 Texas Crim. Rep., 263, 83 S. W. Rep., 204. If the meaning of the language is dubious, then its import, in the opinion of the writer, would be a matter which, under appropriate instructions, the jury would be called upon to determine. The expressions of Judge DAVID-SON, in the opinion of the court, in the case of Jones v. State, 33 Texas Crim. Rep., 497, appear to support this view. From that opinion we quote: "But it may be contended that Veal's conduct towards Mrs. Jones was not 'insulting,' within the meaning of the statute. To determine whether this conduct was or was not insulting, all the testimony bearing on that subject, or in any manner relating to it, should be looked to."

In fact, Articles 1134 and 1135 of the Penal Code appear in harmony with this view. They read thus: "In every case where the defense spoken of in the preceding article is relied on, it shall be competent to prove the general character of the female insulted, in order to ascertain the extent of the provocation."

It is also said: "The jury shall be at liberty to determine in every case whether, under all the circumstances, the insulting words or gestures were the real cause which provoked the killing."

In the instant case, the language imputed to the deceased and quoted in the original opinion was of a character neither obviously insulting within the meaning of the statute, nor otherwise, but its nature was such that the jury might, in the light of the circumstances, have determined to be within the purview of the statute. In the judgment of the writer, it would have been appropriate for the trial court to instruct the jury to determine the purport of the language, and that if it was used and was insulting language toward the wife of the appellant, it would be adequate cause. Whether the trial court committed error which we are called upon to review, the effect of such failure upon the disposition of the case are questions, the decision of which must depend upon the state of the record reflecting the manner of trial and the report of the evidence portraying the facts.

The court instructed the jury upon the law of manslaughter restricting them to no particular facts in evidence in determining the state of the appellant's mind, but expressly instructing them to take into account all the facts.

The appellant excepted to the court's charge upon the ground that it "wholly fails to charge the jury, that insulting words by the deceased toward or concerning a female relative of the defendant would in law be deemed adequate cause" and in connection with this exception refers to Special Charge No. 1, which special charges embodies the whole law of manslaughter and the specific grounds of adequate cause of assault and battery causing pain and insulting words or conduct concerning a female relative. All that is contained in the special charge, which was appropriate, was embodied in the main charge, save that part relating to the insulting words or conduct. The court was not obliged to give this special charge nor would it have been proper to have done so because it would have been a repetition of matters embraced in the main charge. It, however, together with the exception to the charge did direct the attention of the trial court to the fact that appellant contended that the jury should be instructed in the language set out in the special charge, which is as follows: "Insulting words or conduct of the person killed towards or concerning a female relation of the defendant, is in law deemed adequate cause, provided the killing took place immediately upon the uttering of the insulting words towards said female relative. If the defendant was struck by the deceased and the blow caused pain, and it aroused the defendant to such a degree of anger, rage, sudden resentment or terror as render his mind incapable of cool reflection at the time of the homicide; or, if the deceased uttered insulting words towards a female relation of the defendant, and such utterances aroused the defendant to such a degree of anger, rage, sudden resentment or terror, as rendered his mind incapable of cool reflection at the time of the homicide, then, or in either event, the jury should not find him guilty of anything higher than manslaughter."

The adequacy of this exception to direct the mind of the trial court to the specific matter in hand may be questioned. As above indicated, if the court was called upon to instruct upon the language in question at all, it was to require the jury to determine its import. The exception to the charge apparently assumes that the language was insulting toward a female relative and demands of the court that it cause the jury to inquire, not what is meant, but as to whether the language was used. In other words, to determine whether the appellant told the truth when he declared that the language was used. The writer, however, if impressed with the view that the purported language was obviously insulting toward the wife of the appellant would not be inclined to give the statute requiring a specific exception to the charge so narrow an application in this character of cases as to deny to the appellant the benefit of a substantial right.

The language, of course, must be interpreted in the light of the surrounding circumstances and the relation of the parties. These are adverted in sufficient detail in the original opinion. The appellant was the only eyewitness. He admitted the homicide and sought to justify

it, relating that he and deceased, after drinking a number of times, engaged in a game of cards in which the deceased lost his money; that a discussion of the family affairs, which is set out in the original opinion, occurred. The deceased began the difficulty by kicking the appellant out of the car in which they were sitting and attempted to use a pistol upon the appellant which was prevented by the fact that after the deceased, in getting out of the car, was caused to fall by a hole in the bottom. His evidence raises pointedly the theory of self-defense and manslaughter upon the whole facts as well as upon the fact that the deceased struck appellant with a beer-bottle. The law relating to these phases of the evidence was submitted to the jury and was broad enough to include all that was said and done, including a specific instruction that the blow causing pain or bloodshed would be adequate cause. What is said in the opinions heretofore rendered to the point that appellant did not appear to be insulted by the language used, the writer does not conceive to be intended to convey the idea that it is right of the court to determine the effect of the use of insulting language toward a female relative. Such language, when used, is, as a matter of law, cause sufficient to excite passion which will reduce the homicide to manslaughter. Whether it does or not excite passion is a question of fact for the jury. The remarks in the opinions heretofore rendered are conceived by the writer to have been made by way of argument upon the proposition that in the light of the surrounding circumstances the language in question was not regarded by the appellant nor deceased as insulting language toward the female relative of the appellant, and that the trial court, in refusing to give it an interpretation which was not given by either of the parties, was not an error authorizing the court to reverse the judgment. The writer is of the opinion that the language was not obviously within the statute; that at most it was of questionable meaning; that no specific request was made to have the jury determine its import; that the charge requested assumed that it was insulting, and was coupled with other matters embraced in the court's charge, which would have been improper to repeat in an instruction to the jury. The court embraced in his charge on manslaughter the following:

"In order to reduce a voluntary homicide to the grade of manslaughter, it is necessary not only that adequate cause existed to produce the state of mind referred to, that is, of anger, rage, sudden resentment of terror, sufficient to render it incapable of cool reflection, but also that such state of mind did actually exist at the time of the commission of the offense and that it was produced by such adequate cause.

Although the law provides that the provocation causing the sudden passion must arise at the time of the killing, it is your duty in determining the adequacy of the provocation (if any) to consider in connection therewith, all the facts and circumstances in evidence in the case, and if you find that, by reason thereof, the defendant's mind at

the time of the killing was incapable of cool reflection, and that said facts and circumstances were sufficient to produce such state of mind, in a person of ordinary temper, then the proof as to the sufficiency of the provocation satisfies the requirments of the law, and so in this case you will consider all the facts and circumstances in evidence in determining the condition of the defendant's mind at the time of the alleged killing, and the adequacy of the cause (if any) producing such condition."

Having embodied this language in the main charge, the court, in view of the record as presented did not, in refusing to give the special charge requested, or in failing to amend his original charge, upon the suggestions contained in the exception to the main charge and the special charge mentioned, commit an error requiring a reversal of the judgment.

The statutory law covering the necessity and requirements of a charge to the jury is embraced in Articles 735 to 743, Code of Criminal Procedure. Article 743 is in the following language:

"Whenever it appears by the record in any criminal action upon appeal of the defendant that any of the requirements of the nine preceding articles (arts. 735-742) have been disregarded, the judgment shall not be reversed unless the error appearing from the record was calculated to injure the rights of the defendant, or unless it appears from the record that the defendant has not had a fair and impartial trial, and all objections to the charge, and on account of refusal of modification of special charge shall be made at the time of the trial. (O. C. 602; Act 1897, p. 17; Act 1913, p. 278, ch. 138, Sec. 4, amending Art. 743, revised C. C. P.)

The writer has given, since the original motion for rehearing was overruled, the most careful consideration of the record in the light of the strong and forciful Second Motion for Rehearing and oral argument presented by appellant's counsel, and with full consciousness of the heavy responsibility involved in the decision of the matter, and the serious results that must follow an affirmance of the judgment, the writer is of the opinion that a proper response to a sense of duty requires the overruling of the motion, and such is the order.

*Overruled.*

HAWKINS, JUDGE.—(*concurring*).—While not a member of this court at the time the original opinion was rendered, nor when the appellant's motion for rehearing was submitted and the opinion overruling it was delivered, yet in view of the affirmance carrying with it a death penalty, the writer feels that the responsibility resting upon him, as a member of the court now, does not render it inappropriate to say that he has examined the record and the various opinions and has reached the conclusion that the proper disposition has been made of the case.